STATE of Wisconsin, Plaintiff-Respondent,

v.

David A. DEARBORN, Defendant-Appellant.†

Court of Appeals

*No. 2007AP1894–CR. Submitted on briefs January 2, 2008.
—Decided July 24, 2008.*

2008 WI App 131

(Also reported in 758 N.W.2d 463.)

† Petition to review filed.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Eileen A. Hirsch*, assistant public defender, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Anthony J. Pozorski, Sr.*, assistant district attorney, Lancaster.

Before Higginbotham, P.J., Vergeront and Bridge, JJ.

¶ 1. VERGERONT, J.[1] David Dearborn appeals a judgment of conviction for assaulting or otherwise obstructing, or resisting a conservation warden contrary to Wis. Stat. § 29.951 (2005–06)[2] and for possession of tetrahydrocannabinols (THC) contrary to Wis. Stat. § 961.41(3g)(e). He makes two contentions on

---

[1] This appeal was filed as an appeal to be decided by one judge pursuant to Wis. Stat. § 752.31(2)(f), but we ordered that it be converted to a three-judge panel.

[2] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

appeal. First, he asserts his constitutional right to a unanimous verdict was violated by the jury instruction stating that he may be found guilty of violating § 29.951 if the jury found he assaulted or resisted or obstructed a conservation warden, rather than requiring the jury to unanimously agree on which he did. Second, he asserts the circuit court erred in denying his motion to suppress evidence found from a search of the passenger compartment of his vehicle.

¶ 2. We conclude that WIS. STAT. § 29.951 defines one crime with multiple modes of commission and comports with the applicable fundamental fairness standard embodied in the due process clause. Therefore, the jury did not need to be unanimous on the mode of commission and the jury instruction did not violate Dearborn's constitutional right to a unanimous jury verdict.

¶ 3. We also conclude, relying on *State v. Littlejohn*, 2008 WI App 45, 307 Wis. 2d 477, 747 N.W.2d 712,[3] that the search of the passenger compartment of Dearborn's vehicle did not violate his constitutional right to be free from unreasonable search and seizure. Accordingly, we affirm.

BACKGROUND

¶ 4. The charges arose out of events occurring after a Department of Natural Resources (DNR) warden, Martin Stone, pulled over a truck that Dearborn

---

[3] A petition for review was filed in *State v. Littlejohn*, 2008 WI App 45, 307 Wis. 2d 477, 747 N.W.2d 712, but the petition was placed on hold pending the supreme court's resolution of *State v. Denk*, 2006AP1744–CR (cert. accepted Mar. 18, 2008). Wisconsin Supreme Court and Court of Appeals Case Access, *http://wscca.wicourts.gov/index.xsl*.

was driving. The warden and a state trooper, who later arrived in response to the warden's call, were the only witnesses to the incident at the trial. The following summary of facts is based on their testimony.

¶ 5. The warden was on duty, parked in an area along the lower Wisconsin River and observing people fishing. A man in a truck pulled up next to his vehicle, made a rude gesture, and drove off. The warden ran the truck's license plates and discovered that the owner of the vehicle, David Dearborn, had a revoked driver's license. The warden followed the truck and pulled it over, activating his lights. Dearborn, the driver and only occupant, got out of his truck and walked towards the warden. After the warden instructed Dearborn to get back into his truck, Dearborn shut and locked his truck door and remained outside. The warden obtained Dearborn's driver's license, verified his identity, and double checked his revoked status with dispatch after Dearborn denied he was revoked. The warden then told Dearborn he was under arrest for operating a vehicle after revocation. Dearborn became upset, resisted being handcuffed, and refused to turn over his car keys at the warden's request. Believing Dearborn was going to run, the warden tried to grab his wrist and the two became entangled and fell to the ground.

¶ 6. Once on the ground, Dearborn continued to resist being handcuffed by pushing and kicking. After getting up, the warden tried to subdue Dearborn with pepper spray, but was unsuccessful because Dearborn swung his jacket at the warden, thereby avoiding the spray. Dearborn ran to a nearby house, picked up rocks of varying sizes, and positioned himself as if he was going to throw them at the warden. He dropped the rocks after the warden drew his gun. Dearborn ran to the front door of the house and grabbed the door,

shaking it and yelling and screaming. The warden caught up with him and tried once again to get Dearborn's hands behind his back, but Dearborn started kicking and punching again. This time the warden was able to partially subdue Dearborn with pepper spray and he called for backup. A state trooper arrived and he and the warden together were able to make Dearborn let go of the door handle and to handcuff him. They sat Dearborn in the trooper's squad car, but he refused to put his feet in; he complied when the trooper threatened to "make him" do it.

¶ 7. Once Dearborn was in the squad car, the warden searched the passenger compartment of Dearborn's vehicle and found a container holding a small amount of marijuana and some objects that the warden identified as drug paraphernalia.

¶ 8. The State charged Dearborn with assaulting or otherwise resisting or obstructing a warden in violation of Wis. Stat. § 29.951, possession of THC in violation of Wis. Stat. § 961.41(3g)(e), and possession of drug paraphernalia in violation of Wis. Stat. § 961.573(1). Dearborn filed a pretrial motion to suppress the evidence discovered in his vehicle on the ground that the search was unconstitutional. The court denied the motion.

¶ 9. At the jury instruction conference Dearborn proposed an instruction for the Wis. Stat. § 29.951 charge that referred only to resisting a warden. The State's proposal described the first element of the offense as "assault[ing], resist[ing] or obstruct[ing]" and also defined "resist[ing]" and "obstruct[ing]." Dearborn defended his proposed instruction and objected to the State's proposal on the ground that, if the jury received instructions on both resisting and obstructing, some jurors could find him guilty of one, some of the other,

and that would deny him the right to a unanimous jury verdict. The court disagreed with Dearborn and gave the instruction prepared by the State, which did not require the jury to unanimously agree as to whether Dearborn specifically resisted or obstructed.

¶ 10. The jury found Dearborn guilty of the Wis. Stat. § 29.951 charge and the THC possession charge and not guilty of possession of drug paraphernalia. The court sentenced Dearborn to four months in jail on the former charge, one month on the latter charge, stayed both sentences, and ordered probation for one year.

## DISCUSSION

¶ 11. Dearborn raises two issues on appeal: (1) did the jury instruction the court gave on the Wis. Stat. § 29.951 charge violate his constitutional right to a unanimous verdict? and (2) was the search of his vehicle unreasonable under the Fourth Amendment to the United States Constitution?

I. Unanimity

¶ 12. Wisconsin Stat. § 29.951, provides:

> **Resisting a warden**. Any person who assaults or otherwise resists or obstructs any warden in the performance of duty shall be subject to the penalty specified in s. 939.51 (3) (a) [a Class A misdemeanor].[4]

¶ 13. The jury was instructed that there were four elements to the offense, each of which must be proved beyond a reasonable doubt: (1) the defendant as-

---

[4] The penalty for a Class A misdemeanor is a fine not to exceed $10,000 or imprisonment not to exceed nine months or both. Wis. Stat. § 939.51(3)(a).

saulted, resisted, or obstructed a conservation warden; (2) the conservation warden was doing an act in an official capacity; (3) the conservation warden was acting lawfully; and (4) the defendant knew that Martin Stone was a conservation warden acting in his official capacity and with lawful authority and knew the conduct would constitute an assault of the warden or would resist or obstruct the warden.

¶ 14. With respect to the first element, the jury was instructed:

1. The defendant assaulted, resisted, or obstructed a conservation warden.

> To resist a conservation warden means to oppose the warden by force or threat of force. The resistance must be directed to the warden personally.

> To obstruct a conservation warden means that the conduct of the defendant prevented or made more difficult the performance of the warden's duties.[5]

¶ 15. Dearborn contends that, by referring to "resists" and "obstructs," Wis. Stat. § 29.951 proscribes two

---

[5] These definitions of "resist" and "obstruct" are the same as those in the pattern jury instructions for Wis. Stat. § 946.41. This statute provides in relevant part:

**Resisting or obstructing officer. (1)** Whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority, is guilty of a Class A misdemeanor.

**(2)** In this section:

(a) "Obstructs" includes without limitation knowingly giving false information to the officer or knowingly placing physical evidence with intent to mislead the officer in the performance of his or her duty including the service of any summons or civil process.

separate types of conduct.[6] The instruction, he asserts, allows the jury to find Dearborn guilty if he either resisted or obstructed without instructing the jury that it must be unanimous in deciding which act Dearborn did. Thus, he argues, some jurors may have decided that Dearborn resisted because there was evidence that he opposed the warden by force or threat. Others may not have been persuaded that he resisted, viewing that evidence as self-defense in response to unreasonable or excessive force; these latter jurors may have decided he obstructed based on other evidence that could meet the definition given for "obstruct." This, he asserts, is a violation of his constitutional right to a unanimous verdict.

¶ 16. The State responds that unanimity is not required on whether Dearborn's conduct constituted assaulting or resisting or obstructing a warden in the performance of duty.[7]

---

Wis JI—Criminal 1765, Resisting An Officer, provides that "To resist an officer means to oppose the officer by force or threat of force. The resistance must be directed to the officer personally." Wis JI—Criminal 1766, Obstructing An Officer, provides that "To obstruct an officer means that the conduct of the defendant prevents or makes more difficult the performance of the officer's duties."

[6] Dearborn acknowledges that the statute and the jury instruction given also include "assaults." He explains that no issue with respect to assault was raised by defense counsel in the circuit court and thus on appeal his argument is based only on the "resists" and "obstructs" language. However, because the unanimity analysis depends upon legislative intent, our analysis includes all three terms used in the statute.

[7] We note that, given the definition of "obstruct" that was provided the jury—"to prevent or make more difficult the performance of the officer's duty"—it would appear that any

¶ 17. The right to a jury trial guaranteed by article I, sections 5 and 7 of the Wisconsin Constitution includes the right to a unanimous verdict with respect to the ultimate issue of guilt or innocence. *State v. Derango*, 2000 WI 89, ¶ 13, 236 Wis. 2d 721, 613 N.W.2d 833. The primary justification for the unanimity requirement is that it ensures that each juror is convinced that the prosecution has proved each essential element of the offense beyond a reasonable doubt. *Id.* "Jury unanimity, however, is required 'only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged, and . . . not . . . with respect to the alternative means or ways in which the crime can be committed.' " *Id.*, ¶ 14 (citations omitted) (alteration in original).

¶ 18. The threshold question in a unanimity challenge is therefore whether the statute creates multiple offenses or a single offense with multiple modes of commission. *Id.* This presents a question of statutory construction, which is a question of law, and our review is therefore de novo. *State v. Derango*, 229 Wis. 2d 1, 11, 599 N.W.2d 27 (Ct. App. 1999), *aff'd*, 236 Wis. 2d 721.

¶ 19. If we conclude the legislature intended multiple offenses, then the jury must be unanimous as to each crime. *State v. Hammer*, 216 Wis. 2d 214, 219, 576 N.W.2d 285 (Ct. App. 1997). On the other hand, if we conclude the legislature intended to create one crime with alternate modes of commission, we apply the due process fundamental fairness test utilized in *Schad v.*

conduct that constituted resisting an officer would also constitute obstructing an officer. However, neither party raises this point; in particular, the State does not assert this has a bearing on the unanimity analysis. Therefore we do not address this issue.

*Arizona*, 501 U.S. 624, 637–45 (1991). *See Derango*, 236 Wis. 2d 721, ¶¶ 23–25.[8] Whether the statute meets that constitutional standard presents a question of law, which we review de novo. *See State v. Piddington*, 2001 WI 24, ¶ 13, 241 Wis. 2d 754, 623 N.W.2d 528 (reconciling constitutional consideration of due process with statutory requirements presents question of law).

¶ 20. Turning to the threshold question of the legislature's intent, we consider: (1) the language of the statute; (2) the legislative history and context of the statute; (3) the nature of the proscribed conduct; and (4) the appropriateness of multiple punishment for the conduct. *Derango*, 236 Wis. 2d 721, ¶ 15.[9]

---

[8] In its brief, the State relies on the "conceptually distinct test" the supreme court utilized in *Holland v. State*, 91 Wis. 2d 134, 139, 280 N.W.2d 288 (1979), which relied on *United States v. Gipson*, 553 F.2d 453 (5th Cir. 1977). However, in *State v. Derango*, 2000 WI 89, ¶ 22, 236 Wis. 2d 721, 613 N.W.2d 833, the supreme court explained that the United States Supreme Court in *Schad v. Arizona*, 501 U.S. 624, 635 (1991), had rejected the "conceptually distinct" test in favor of a due process fundamental fairness test and it applied the *Schad* test. The supreme court reaffirmed that the *Schad* test was the correct test in *State v. Norman*, 2003 WI 72, ¶¶ 61–62, 262 Wis. 2d 506, 664 N.W.2d 97.

[9] In *State v. Hammer*, 216 Wis. 2d 214, 221, 576 N.W.2d 285 (Ct. App. 1997), we stated that, because it was clear that the statutory language there in dispute plainly set forth a single crime with alternative modes of commission, we did not need to address the remaining three factors to determine legislative intent in unanimity cases. In support of this statement, we cited to *State v. Vinje*, 201 Wis. 2d 98, 101–02, 548 N.W.2d 118 (Ct. App. 1996), which was not a unanimity case but did involve statutory construction. In *Vinje*, in setting forth the principles we ordinarily apply when we construe statutes, we stated that

¶ 21. The framework of Wis. Stat. § 29.951 is that all three terms—assault, resist, and obstruct—are contained in one sentence and connected by a disjunctive, with one penalty provided. In *Manson v. State*, the court initially observed that the framework of that statute, setting forth alternative modes for committing robbery in two separate paragraphs, "lends plausibility to the interpretation that the legislature intended to define two crimes[,]" although the court ultimately concluded other features of the statutory language suggested it described one crime. 101 Wis. 2d 413, 422, 428, 304 N.W.2d 729 (1981). Then, in consulting the legislative history, the *Manson* court concluded that the fact that earlier versions of that statute set forth the alternative modes in one paragraph in the disjunctive, with one penalty provided, supported the conclusion that the legislature intended to define one offense with alternative modes of accomplishing the offense. *Id.* at 423–25. Applying the reasoning of the *Manson* court, we conclude that the framework of § 29.951 indicates the legislature intended to define one crime.

¶ 22. In addition, the language of Wis. Stat. § 29.951 provides that anyone who "assaults or *otherwise* resists or obstructs any warden in the performance of

"[i]f the language of the statute clearly and unambiguously sets forth the legislative intent, it is the duty of the court to apply that intent to the case at hand and not look beyond the statutory language to ascertain its meaning." *Id.* at 102 (citation omitted).

However, in *Derango*, 236 Wis. 2d 721, ¶¶ 15–22, decided after *Hammer*, the supreme court analyzed all four factors even though it concluded the statutory language created only one offense. We therefore do not rely on *Hammer* and we analyze all four factors even though we conclude the statutory language indicates an intent to create only one offense.

duty . . ." shall be subject to the specified penalty. (Emphasis added.) The word "otherwise" makes clear that the statute is not listing three separate categories of activities. Instead, this language indicates that assaulting is one among other ways of resisting a warden in the performance of duty and also one among other ways of obstructing a warden in the performance of duty.

¶ 23. Finally, we note that all three types of conduct—assaulting, resisting, and obstructing—are penalized only if they occur in the performance of the warden's duty, and all plainly interfere with the performance of a warden's duty. The language of the statute thus indicates an emphasis on the fact that the conduct is directed at a warden in the performance of his or her duty and interferes with that performance. It does not indicate an intent to precisely distinguish between the types of conduct that accomplish that end so as to punish each separately.

¶ 24. Dearborn contends that *State v. Welch*, 37 Wis. 196, 200 (1875), establishes that "resist" and "obstruct" have different meanings and therefore they are different crimes. In *Welch*, the court interpreted a statute penalizing "resist[ing] an officer engaged in the lawful execution of lawful process."[10] *Id.* The issue in *Welch* was whether the actions of a defendant who caused horses to run away from a law enforcement officer who was attempting to serve a writ of replevin on the defendant for the horses constituted "resisting." *Id.* at 198–99. The court concluded it did not. *Id.* at 204.

---

[10] The statute construed in *State v. Welch*, 37 Wis. 196 (1875), R.S. ch. 167 § 18 (1858), is a predecessor to Wis. Stat. § 946.41. *See supra* note 5. "Obstruct" was not added until 1957, by 1957 Wis. Laws, ch. 242, § 2, many years after the predecessor to Wis. Stat. § 29.951 was first enacted containing the term "obstruct." *See infra* note 11.

The court held that "resisting" means "to oppose by direct, active and *quasi* forcible means[,]" *Id.* at 201 (emphasis in original), and did not include "passive, indirect and circuitous impediments." *Id.* The court observed that statutes in other jurisdictions used words such as "oppose, obstruct, hinder, prevent, interrupt, intimidate, etc." and "many or all of these words would include passive, indirect and circuitous impediments to the service of process." *Id.*

¶ 25. We agree with Dearborn that *Welch* is relevant in determining the legislature's intent in Wis. Stat. § 29.951. The predecessor to § 29.951, with substantially the same wording, was enacted by 1931 Wis. Laws, ch. 278, § 2.[11] We therefore assume the legislature was aware of *Welch* when it chose to use the terms "resisting" and "obstructing" in the predecessor to § 29.951. *See State v. Grady*, 2006 WI App 188, ¶ 9, 296 Wis. 2d 295, 722 N.W.2d 760 (we assume the legislature is aware of the relevant case law when it enacts legislation).

¶ 26. However, we do not agree that *Welch* supports Dearborn's position that the legislature intended "resists" and "obstructs" in Wis. Stat. § 29.951 to constitute separate crimes. *Welch* establishes that "resist" and "obstruct" have different meanings. "Resist" means "to oppose by direct, active and *quasi* forcible means" and does not include passive or indirect methods of imped-

---

[11] When first enacted the statute was codified as Wis. Stat. § 29.64 (1931) and provided:

> **Resisting conservation warden.** Any person who shall assault or otherwise wilfully resist or obstruct any conservation warden in the performance of his duty shall be punished by a fine of not more than five hundred dollars, or by imprisonment in the county jail not more than six months, or by both such fine and imprisonment.

ing a warden's or officer's performance of duty. 37 Wis. at 201 (emphasis in original). The *Welch* court did not define "obstruct" but did indicate that it includes conduct that "resist" does not include. *See Id.* Thus, in proscribing obstructing in addition to resisting in § 29.951, the legislature intended to proscribe a broader range of conduct than resisting. However, it does not follow that the legislature intended resisting and obstructing to constitute separate crimes subject to separate punishment, rather than alternative modes of committing one crime.

¶ 27. Indeed, there is nothing in *Welch* that indicates "resisting" and "obstructing" include entirely separate types of conduct. Although the *Welch* court concluded that "obstructing" (and other terms—"oppose, . . . hinder, prevent, interrupt, intimidate") includes conduct that is not included in "resisting," 37 Wis. at 201, the court did not define "obstruct" and did not suggest that some conduct that comes within the meaning of "resisting" could not also be "obstructing." A common dictionary meaning of "obstruct" is "[t]o impede, retard, or interfere with; hinder." AMERICAN HERITAGE COLLEGE DICTIONARY 942 (3d ed. 1993).[12] Certain conduct that is

---

[12] We consult a dictionary definition for the common meaning of "obstruct" to aid in our analysis of the legislature's intent in WIS. STAT. § 29.951 with respect to one crime or multiple crimes. We recognize that the term "obstruct" is also used in WIS. STAT. § 946.41, *see supra* note 5. The jury instruction for that statute, WIS JI—CRIMINAL 1766, used in this case, defines "obstruct" as conduct that "prevents or makes more difficult the performance of the officer's duties" (when the specific instance of "obstruct" in § 946.41(2)(a) is not used). *See supra* note 5. However, because "obstruct" was added to § 946.41 many years after the predecessor to § 29.951 was first enacted, *see supra* note 10, and because the proper construction of § 946.41 is not

"resisting" as defined by the *Welch* court—"oppose by direct, active and *quasi* forcible means[,]" 37 Wis. at 201—could also be "obstructing": pulling one's arm forcefully away from a warden's hold in an attempt to prevent handcuffing, for example. As for the relationship between "resist" as the *Welch* court defined the term and "assault," the *Welch* court recognized the overlap when it stated that "threats, with the present ability and apparent intention to execute them, might well be resistance, as they might well amount to an assault"; however, in order to constitute resistance there need not be "actual force or even a common assault upon the officer." 37 Wis. at 202.

¶ 28. Thus, applying the *Welch* definition of "resist" and a common dictionary definition of "obstruct," we see there can be overlap in the meaning of these terms. This overlap, like the use of "or otherwise" to link "assault" with both "resist" and "obstruct" is another indication that the intent in WIS. STAT. § 29.951 is not to delineate three distinct types of conduct that constitute three distinct offenses but, instead, to identify the variety of conduct that, when directed at a warden in the performance of duty, interferes with that performance.

¶ 29. Turning to the legislative history of WIS. STAT. § 29.951, we conclude it corroborates our conclusion that the legislature intended to create one crime. The drafting file of the predecessor statute, WIS. STAT. § 29.64 (1931), shows that the legislation was initially

before us, we do not focus on the meaning of "obstruct" in § 946.41. On the other hand, we do not intend to suggest there is a difference in meaning between the term "obstruct" in the two statutes, and we do not see any significant difference between the dictionary definition we employ here and the definition in WIS JI—CRIMINAL 1766.

proposed because of a concern for the increasing diffi-
culties conservation wardens were having in "handling
violators in the field" and the inadequate existing
penalties "for resisting officers, pointing guns at them,
etc." and some recent "close shaves" experienced by
wardens. Drafting File, 1931 Wis. Laws, ch. 278, Legis-
lative Reference Bureau, Madison, Wis. The earlier
drafts in the file prohibit "assault, attempt to assault, or
point a gun at, whether loaded or unloaded, or interfere
with in any manner any conservation warden while
acting in the performance of his duty . . . ." *Id.* The bill
as amended and finally enacted contained the language
"assault or otherwise wilfully resist or obstruct any
conservation warden in the performance of his
duty . . .,"[13] and provided as a penalty a fine of not more
than five hundred dollars or imprisonment in the
county jail for not more than six months, or both a fine
and imprisonment. 1931 Wis. Laws, ch. 278, § 2. At the
time this legislation was enacted, "assault" was a term
used in a number of criminal statutes[14] and was gener-
ally defined in the case law as a "willful attempt to do
bodily harm to another [involving] a wrongful purpose";
it did not, in the criminal law context, have the common
dictionary meaning of "doing of violence by one to
another." *Holmes v. State*, 124 Wis. 133, 140, 102 N.W.
321 (1905).

---

[13] "Wilfully" was deleted by 1975 Wis. Laws, ch. 365, § 47.

[14] For example: Wis. Stat. § 340.36 (1931), "Assault with
intent to murder or maim"; Wis. Stat. § 340.38 (1931), "Assault
regardless of life"; Wis. Stat. § 340.39 (1931), "Assault and theft,
being armed"; Wis. Stat. § 340.40 (1931), "Assault with intent to
murder or rob." In contrast, our current criminal code does not
generally use the term "assault" to describe the penalized
behavior outside the context of sexual assaults as in Wis. Stat.
§ 940.225.

¶ 30. The information in the drafting file thus indicates that the initial impetus for the legislation was the protection of conservation wardens in the field from violators who pointed or used their guns to resist arrest. It also shows that the language finally enacted proscribed a broader range of conduct adversely affecting wardens in the performance of their duties. This information does not indicate an intent to make assaulting, resisting, and obstructing three separate crimes.

¶ 31. As for the nature of the proscribed conduct, this inquiry focuses on "whether the statutory alternatives are similar or significantly different." *Manson*, 101 Wis. 2d at 426. "If the alternatives are similar, one crime was probably intended." *Id.* Alternatives are not dissimilar simply because they include different conduct, such as use of force and threat of imminent use of force, or because the different conduct may have a disparate impact on the victim. *Id.* at 427. Rather, we look at the concept embodied in the alternatives. *See id.* In addition, the court in *Manson* considered it significant that the same conduct could fall within the meaning of both alternatives. *Id.* at 426–27.

¶ 32. We conclude the types of conduct embodied in assaulting, resisting, or obstructing a warden in the performance of duty are similar. These terms embody the concept of acts that interfere with the performance of a warden's duty and, because they have overlapping meanings, some acts may be aptly described by more than one term.

¶ 33. Finally, we consider whether multiple punishments are appropriate. If the proper inquiry here is whether multiple punishments for one act by a defendant of interfering with a warden in the performance of his or her duty are appropriate solely because the act

constitutes both resisting and obstructing, for example, or both assaulting and resisting, then the answer is clearly "no."

¶ 34. However, the case law has described this fourth factor in ways that leave us uncertain how it fits into legislative intent in this case; and neither of the parties address this factor. In *Manson*, the court stated that this factor depends on several considerations, including

> whether [the proscribed actions] are so significantly different that the conduct satisfying each of these criteria may be characterized as separate crimes although each would furnish a factual premise for the violation of the same statute; whether the acts are so close in time that they are to be treated as one; whether each act invades a different interest of the victim which the statutes intend to protect.

*Id.* at 427–28. The court concluded that "[i]n the case of robbery these factors point to the conclusion that multiple punishment would not be appropriate when use of force and threat of force occur in a single taking." *Id.* at 428. In *Derango*, 236 Wis. 2d 721, ¶ 21, the court stated that "[w]e have previously concluded that acts warrant separate punishment when they are separate in time or are significantly different in nature[,]" when citing to *State v. Sauceda*, 168 Wis. 2d 486, 499–500, 485 N.W.2d 1 (1992), a multiplicity case.[15] The court in *Derango* concluded that, because the child enticement statute, WIS. STAT. § 948.07, proscribed only one act

---

[15] The double jeopardy clause protects against multiple punishments for the same offense. *State v. Sauceda*, 168 Wis. 2d 486, 492, 485 N.W.2d 1 (1992). Multiplicity is implicated only to the extent of preventing a court from imposing a greater penalty than the legislature intended. *State v. Derango*, 236 Wis. 2d 721, ¶ 28.

committed with six or more possible mental states, it would not be fair to impose more than one punishment. 236 Wis. 2d 721, ¶ 21.

¶ 35. Thus, both *Manson* and *Derango* refer to the similarity of the proscribed conduct as part of the analysis of the fourth factor. This appears to require the same analysis as does the third factor, and we have already concluded the proscribed conduct is similar.

¶ 36. Both *Manson* and *Derango* also refer to the closeness in time of the acts, but neither case provides guidance on how that bears on discerning legislative intent when there is a unanimity challenge. We note that in multiplicity cases the supreme court has considered the closeness in time in determining whether the defendant committed separate volitional acts. *See, e.g., State v. Tappa*, 127 Wis. 2d 155, 170, 378 N.W.2d 883 (1985); *see also State v. Davidson*, 2003 WI 89, ¶ 110, 263 Wis. 2d 145, 666 N.W.2d 1. Certainly a defendant could commit more than one act that constituted a violation of WIS. STAT. § 29.951 in one extended encounter with a warden, and that might properly give rise to more than one charge under this statute and more than one punishment. However, where, as in this case, there is only one charge, we have difficulty understanding the purpose of analyzing the closeness in time of Dearborn's acts that constitute either assaulting, resisting, or obstructing.

¶ 37. As for the *Manson* consideration of whether each proscribed act invades a different interest of the victim which the statute intends to protect, we conclude that each of the proscribed terms of conduct—assaulting, resisting, and obstructing—invade the same interest of a warden to be free from interference in the performance of his or her duties. However, in arriving at this conclusion we do not mean that, in a particular

case, a defendant could not properly be charged with more than one violation of WIS. STAT. § 29.951 for acts that occurred during one encounter with a warden.

¶ 38. In spite of our uncertainty over the scope and purpose of the fourth factor, we conclude the legislature intended to define a single crime in WIS. STAT. § 29.951 with multiple modes of commission. The first three factors—statutory language, legislative history, and similarity of the proscribed conduct—support this conclusion, as do at least some of the considerations in the fourth factor. In addition, even if we were to decide that the fourth factor weighed in favor of legislative intent to define multiple crimes in § 29.951, we are persuaded that the statutory language and the legislative history are far stronger indications of the legislature's intent.

¶ 39. Having concluded that WIS. STAT. § 29.951 describes one crime that can be performed in multiple ways, we turn to *Schad*'s due process test of fundamental fairness. *See Derango*, 236 Wis. 2d 721, ¶¶ 23–24. The Court in *Schad* stated:

> We are convinced, however, of the impracticability of trying to derive any single test for the level of definitional and verdict specificity permitted by the Constitution, and we think that instead of such a test our sense of appropriate specificity is a distillate of the concept of due process with its demands of fundamental fairness and for the rationality that is an essential component of that fairness .... In translating these demands for fairness and rationality into concrete judgments about the adequacy of legislative determinations, we look both to history and wide practice as guides to fundamental values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may

789

satisfy the *mens rea* element of a single offense. The enquiry is undertaken with a threshold presumption of legislative competence to determine the appropriate relationship between means and ends in defining the elements of a crime.

501 U.S. at 637–38 (citation omitted).

¶ 40. The Court in *Schad* concluded that due process did not require unanimity for the agreement of two alternative mental states for the crime of murder because of the historical acceptance of this and the moral equivalency of the alternative mental states. *Id.* at 640–45.

██

¶ 41. Applying *Schad*'s due process test, we conclude that unanimity is not required. As the court did in *Derango*, 236 Wis. 2d 721, ¶ 24, we start with the presumption from *Schad* that the legislature made a constitutionally viable choice in creating Wis. Stat. § 29.951 to describe one crime with multiple modes of commission. *Schad*, 501 U.S. at 637–38. We next observe that § 29.951 does not appear to have the type of lengthy history rooted in common law that the Court in *Schad* found existed with respect to murder. *Id.* at 640–43. However, *Schad* recognized that this could be true for many modern statutes, *id.* at 640 n.7, and the *Derango* court found this to be true of the child enticement statute addressed there. 236 Wis. 2d 721, ¶ 24. Finally, we consider that assaulting, resisting, and obstructing a warden in the performance of duty are of similar moral culpability in that they are each ways to interfere with a warden's performance of duty.

¶ 42. Because Wis. Stat. § 29.951 creates one crime with multiple modes of commission and does not offend the due process standard employed in *Schad*, we conclude that jury unanimity as to the manner in which

a defendant violates § 29.951 is not required. Therefore, Dearborn was not denied his due process right to a unanimous jury verdict.

## II. Vehicle Search

¶ 43. Dearborn asserts that the search of the passenger compartment of his car violated his right to be free from unreasonable search and seizure under the Fourth Amendment of the Untied States Constitution, as well as article I, section 11 of the Wisconsin Constitution. He asserts that the search did not fall within the exception to the warrant requirement for a search incident to a lawful arrest as articulated in *Chimel v. California*, 395 U.S. 752, 762–63 (1969), because it was not justified by the purposes underlying that exception —officer safety nor prevention of destruction or concealment of evidence. This is so, according to Dearborn, because the search did not occur until he was in the squad car, handcuffed.

¶ 44. The State contends that Dearborn waived this issue by failing to raise it in the circuit court. We assume without deciding that Dearborn failed to preserve this issue in the lower court. However, the waiver rule is one of judicial administration, not judicial authority. *See State v. Moran*, 2005 WI 115, ¶ 31, 284 Wis. 2d 24, 700 N.W.2d 884. Because this issue involves a question of law, has been briefed by the parties, and is of sufficient public interest to merit a decision, we choose to decide it. *See id.*

¶ 45. When we review a motion to suppress, we affirm the circuit court's findings of fact unless they are clearly erroneous. *State v. Pallone*, 2000 WI 77, ¶ 27,

236 Wis. 2d 162, 613 N.W.2d 568. We review de novo the circuit court's application of constitutional principles to the facts. *Id.*

¶ 46. We conclude our decision in *Littlejohn* is controlling and resolves this issue against Dearborn. As in this case, in *Littlejohn* the police searched the passenger compartment of the defendant's vehicle after he was arrested outside the vehicle, handcuffed, and secured in a police vehicle at the scene. 307 Wis. 2d 477. Littlejohn's car was locked, *id.*, ¶ 15, as was Dearborn's. Littlejohn made the same argument that Dearborn makes—that the search-incident-to-arrest exception did not apply because he was locked in the back of a police car and his vehicle therefore was not within his "immediate control." *Id.*, ¶ 6. In addition, Littlejohn argued, as does Dearborn, that *Soehle v. State*, 60 Wis. 2d 72, 208 N.W.2d 341 (1973), holds a search of a vehicle locked at the time of arrest is an invalid search incident to an arrest. *Id.*, ¶ 15.

¶ 47. We rejected both arguments in *Littlejohn*. We stated that, under *State v. Fry*, 131 Wis. 2d 153, 388 N.W.2d 565 (1986), and subsequent case law interpreting *Fry*, "the government is not required to show in each case that the area searched was actually accessible to the arrestee at the time of the search"; *Littlejohn*, 307 Wis. 2d 477, ¶ 11; rather, the inquiry, as stated in *Fry* was "whether a vehicle's passenger compartment was within 'the area into which an arrestee might reach.' " *Id.*, ¶ 18 (citations omitted). We concluded that *Fry* had decided this standard was met on facts that were not meaningfully distinguishable from Littlejohn's situation. *Id.*, ¶¶ 18, 19. We also concluded that *Fry* had overruled *Soehle* to the extent the latter case could be

read to hold that a search of a vehicle locked at the time of arrest was an invalid search incident to an arrest. *Id.*, ¶ 15.

¶ 48. Because *Littlejohn* is controlling, we conclude the search of the passenger compartment of Dearborn's car did not violate his right to be free from unreasonable searches. Therefore he was not entitled to suppression of the evidence seized in that search.

## CONCLUSION

¶ 49. We conclude that Wis. Stat. § 29.951 defines one crime with multiple modes of commission and comports with the applicable fundamental fairness standard embodied in the due process clause. Therefore, the jury did not need to be unanimous on the mode of commission and the jury instruction did not violate Dearborn's constitutional right to a unanimous jury verdict. We further conclude, relying on *Littlejohn*, that the search of the passenger compartment of Dearborn's vehicle did not violate his constitutional right to be free from unreasonable search and seizure. Accordingly, we affirm

*By the Court.*—Order affirmed.