STATE of Wisconsin,
Plaintiff-Respondent,

v.

David A. DEARBORN,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2007AP1894–CR. Oral argument April 13, 2010.
—Decided July 15, 2010.*

2010 WI 84

(Also reported in 786 N.W.2d 97.)

253

255

For the defendant-appellant-petitioner there were briefs and oral argument by *Eileen A. Hirsch,* assistant state public defender.

For the plaintiff-appellant the cause was argued by *Michael J. Losse,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. MICHAEL J. GABLEMAN, J. This is a review of a published decision of the court of appeals[1] affirming

---

[1] *State v. Dearborn,* 2008 WI App 131, 313 Wis. 2d 767, 758 N.W.2d 463.

the circuit court's judgment of conviction against David A. Dearborn.[2] Dearborn asserts that the circuit court erred in denying his motion to suppress evidence obtained from a search of the passenger compartment of his locked vehicle, a search that occurred after he was placed under arrest and secured in the back of a squad car.

¶ 2. Dearborn maintains, and the State concedes, that in the wake of the United States Supreme Court's ruling in *Arizona v. Gant,* 556 U.S. ___, 129 S. Ct. 1710 (2009), the search of Dearborn's truck violated his constitutional right to be secure against unreasonable searches and seizures. The main question in this case is whether the exclusionary rule should be applied to remedy the constitutional violation, or alternatively, whether the good faith exception should preclude application of the exclusionary rule and the evidence's consequent suppression.[3]

¶ 3. Prior to the United States Supreme Court's decision in *Gant,* this court made clear in *State v. Fry,* 131 Wis. 2d 153, 388 N.W.2d 565 (1986), and its progeny

---

[2] Dearborn was convicted of assaulting or otherwise obstructing, or resisting a conservation warden in violation of Wis. Stat. § 29.951 (2005–06), and for possession of tetrahydrocannabinols (THC) in violation of Wis. Stat. § 961.41(3g)(e) (2005–06). All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

[3] The parties also briefed and argued the question of whether Dearborn's constitutional right to a unanimous jury verdict was violated because the jury instruction given at trial for § 29.951 did not require the jury to unanimously determine that he assaulted a warden, resisted a warden, or obstructed a warden. We decline to separately address this question and affirm the decision and reasoning of the court of appeals. *State v. Dearborn,* 2008 WI App 131, ¶¶ 12–42, 313 Wis. 2d 767, 758 N.W.2d 463.

that the type of search conducted of Dearborn's truck following his arrest was lawful. However, we now accept *Gant*'s interpretation of the United States Constitution and adopt its holding as the proper interpretation of the Wisconsin Constitution's protection against unreasonable searches and seizures. Thus, the search of Dearborn's truck violated his constitutional rights.

¶ 4. However, we decline to apply the remedy of exclusion for the constitutional violation. We hold that the good faith exception precludes application of the exclusionary rule where officers conduct a search in objectively reasonable reliance upon clear and settled Wisconsin precedent that is later deemed unconstitutional by the United States Supreme Court. Accordingly, we affirm the court of appeals and uphold Dearborn's conviction.

## I. BACKGROUND

¶ 5. On April 9, 2006, State Department of Natural Resources conservation warden Martin Stone was on his regular patrol, checking fishing license compliance in various locations in Richland County. The warden stopped at the Port Andrews boat landing to get a better look at the fishermen who were below a nearby bridge. David A. Dearborn had been sitting in his truck at the boat landing, but left soon after the warden arrived in his squad car. Dearborn then drove close to the warden's squad car, slowed down, and made an obscene gesture while glaring angrily at the warden. Concerned about his safety, the warden ran Dearborn's license plate and learned that Dearborn's license had been revoked for operating while intoxicated.

¶ 6. The warden then pursued Dearborn and pulled him over. Dearborn immediately exited his vehicle and walked toward the warden. The warden

instructed Dearborn to get back in his truck, but Dearborn instead shut the door and locked his vehicle. The warden spoke with Dearborn and verified his identity. Dispatch confirmed that Dearborn was driving with a revoked license, and the warden told Dearborn he was placing him under arrest.

¶ 7. Dearborn became mad and refused to submit to arrest. As the warden tried to arrest him, Dearborn resisted by pushing and kicking. When the warden tried to subdue Dearborn with pepper spray, Dearborn waved a jacket in front of himself to deflect the spray. Dearborn then ran to a nearby house, picked up rocks, and started to wind up as if to throw them. The warden drew his gun in response, which persuaded Dearborn to put the rocks down. Even so, Dearborn kept resisting. He ran to the door of the nearby home and began yelling and shaking the doorknob. After the warden's additional attempt to arrest Dearborn was met with more kicking and punching, the warden again used pepper spray and was finally able to secure Dearborn until backup arrived.

¶ 8. Once backup arrived, Dearborn was placed under arrest and secured in handcuffs in the back of a squad car. The warden and a state trooper then unlocked and searched Dearborn's truck. Inside the passenger compartment, they found a small wooden container known as a "dugout" that contained a small amount of marijuana and a small metal pipe that smelled like burnt marijuana.

¶ 9. On April 11, 2006, a criminal complaint was filed in the Grant County Circuit Court, George S. Curry, Judge. Dearborn was charged with resisting a conservation warden, possession of THC, and possession of drug paraphernalia. Dearborn filed a pretrial motion to suppress the evidence obtained through the

259

search of his vehicle on the grounds that the search was unconstitutional, but the circuit court denied the motion. A jury found Dearborn guilty of resisting a conservation warden and possession of THC, but not guilty of possession of drug paraphernalia.

¶ 10. Dearborn appealed.[4] The court of appeals "assume[d] without deciding" that the issue was not preserved because Dearborn did not move at trial to suppress the evidence of the search on the grounds that it was not a valid search incident to arrest. *Dearborn,* 313 Wis. 2d 767, ¶¶ 43–44. But the court agreed to hear the issue because it was a question of law, was briefed by the parties, and was of sufficient public interest to merit a decision.[5] *Id.*

¶ 11. The court of appeals rejected Dearborn's claim, relying heavily on *State v. Littlejohn,* 2008 WI App 45, 307 Wis. 2d 477, 747 N.W.2d 712 (pet. review granted). In that case, which this court also is deciding today, the court of appeals rejected a nearly identical argument that a search of a locked vehicle after a defendant is under arrest and secured in a squad car violates the Fourth Amendment because the area searched is not in the "immediate control" of the suspect. *Littlejohn,* 307 Wis. 2d 477, ¶ 15; *Dearborn,* 313 Wis. 2d 767, ¶ 46. Thus, the court of appeals held that

---

[4] On the issue of the required unanimity in a jury verdict (*see* supra note 3), the court of appeals held that Wis. Stat. § 29.951 defines one crime with multiple modes of commission (assault, resist, or obstruct), rather than multiple crimes. *Dearborn,* 313 Wis. 2d 767, ¶ 42. Therefore, for a guilty verdict, the jury was only required to find that the defendant committed the crime, not *how* he committed it. *Id.*

[5] On review before this Court, the parties agree that this issue should be heard regardless of whether it was waived.

Dearborn's Fourth Amendment rights had not been violated, and that the search was proper.

¶ 12. In his petition for review before this court, Dearborn noted that the United States Supreme Court agreed to address a nearly identical question. We therefore held Dearborn's case and agreed to hear it following the United States Supreme Court's decision in *Gant.*

## II. STANDARD OF REVIEW

¶ 13. The application of constitutional principles to a particular case is a question of constitutional fact. *State v. Pallone,* 2000 WI 77, ¶ 26, 236 Wis. 2d 162, 613 N.W.2d 568. We accept the circuit court's findings of fact unless they are clearly erroneous. *Id.,* ¶ 27. The application of constitutional principles to those facts is a question of law that we review de novo. *Id.*

## III. DISCUSSION

¶ 14. The right to be secure against unreasonable searches and seizures is protected by both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Wisconsin Constitution.[6] *State v. Sykes,* 2005 WI 48, ¶ 13, 279 Wis. 2d 742, 695 N.W.2d 277. We have historically interpreted the Wis-

---

[6] The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

consin Constitution's protections in this area identically to the protections under the Fourth Amendment as defined by the United States Supreme Court.[7] *State v. Kramer,* 2009 WI 14, ¶ 18, 315 Wis. 2d 414, 759 N.W.2d 598. Wisconsin Stat. § 968.11 also provides various restrictions on the scope of a search incident to a lawful arrest.

¶ 15. When there has been an unlawful search, a common judicial remedy for the constitutional error is exclusion. *State v. Eason,* 2001 WI 98, ¶¶ 39–45, 245 Wis. 2d 206, 629 N.W.2d 625. That is, illegally obtained evidence will be suppressed as a consequence of the law enforcement officers' misconduct. *Id.* The policies underlying both exclusion and the good faith exception to the exclusionary rule will be discussed more fully below.

¶ 16. The question before us is whether the good faith exception to the exclusionary rule should apply when clear and settled precedent, reasonably relied upon by law enforcement, is subsequently overruled.

¶ 17. We begin in Part A by discussing the implications of the United States Supreme Court's decision in *Gant.* We conclude that the search of Dearborn's truck was lawful under clear and settled Wisconsin precedent before the *Gant* decision, and that the officers here reasonably relied on this law in conducting the search. Yet, we do adopt the holding of *Gant* as the

---

The text of Article 1, Section 11 of the Wisconsin Constitution is identical but for minor variances in capitalization and punctuation.

[7] The only exception to this consistent tradition of interpreting the Wisconsin and United States constitutions the same in this area is our addition of two requirements to application of the good faith exception when officers rely on defective no-knock search warrants. *See State v. Eason,* 2001 WI 98, 245 Wis. 2d 206, 629 N.W.2d 625.

proper construction of Article 1, Section 11 of the Wisconsin Constitution, and recognize that, in light of *Gant,* the search of Dearborn's truck was in fact unlawful.

¶ 18. In Part B, we move to the proper remedy for this constitutional violation, focusing on the exclusionary rule and its tension with the retroactivity rule. We ultimately decline to enforce the remedy of exclusion for the unlawful search of Dearborn's truck. The principles underlying the exclusionary rule, and the good faith exception in particular, counsel that suppression of this evidence would have no deterrent effect and would therefore be unjustified.

### A. Wisconsin Law and *Arizona v. Gant*

¶ 19. The parties agree that under *Arizona v. Gant,* the search here violated Dearborn's constitutional right to be free from unreasonable searches and seizures. The parties disagree, however, with the state of Wisconsin law pre-*Gant.* Dearborn argues that the search here was unlawful under Wisconsin law as it existed before *Gant,* while the State maintains that the search was conducted in reliance on settled Wisconsin precedent. A brief history of the case law in this area will put the dispute in context.

¶ 20. In *Chimel v. California,* 395 U.S. 752 (1969), the United States Supreme Court established the basic analysis underlying a search incident to arrest. It explained:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endan-

gered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

*Id.* at 762–63. Thus, the principle was established that officers may search the area an arrestee might be able to reach—an area "within his immediate control"—in the course of an arrest.

¶ 21. In 1981, the United States Supreme Court examined whether the passenger compartment of an automobile was subject to a search when the occupant is placed under lawful arrest. *New York v. Belton*, 453 U.S. 454, 455 (1981). The court noted the difficulty of determining the area within the immediate control of the arrestee and expressed a desire to establish a clear principle that law enforcement officers could rely on. *Id.* at 460. The court thus held "that when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* The court went on to say that any containers in the passenger compartment could also, by logical extension, be searched as incident to a lawful arrest. *Id.* at 460–61.

¶ 22. Justice Brennan wrote a dissent in *Belton* that chastised the court for choosing a bright-line rule

that failed to reflect the underlying policy justifications in *Chimel*. *Id.* at 463–64 (Brennan, J., dissenting). He noted that *Chimel* pointed to the danger that the arrestee could reach weapons or contraband, and that this danger was eliminated following a lawful arrest. *Id.* at 466. The Court, Justice Brennan argued, had adopted the fiction "that the interior of a car is *always* within the immediate control of an arrestee who has recently been in the car." *Id.*

¶ 23. Following the Supreme Court's decision in *Belton*, state and federal courts around the country took the general, "bright-line" principle announced in *Belton* to mean that actual accessibility was no longer needed; rather, passenger compartments were searchable as long as the arrestee was at the scene. *See Gant*, 129 S. Ct. at 1718 ("[O]ur opinion [in *Belton*] has been widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there is no possibility the arrestee could gain access to the vehicle at the time of the search.").[8] Wisconsin, like nearly every other jurisdiction to address the question, likewise understood *Belton* to adopt a bright-line rule allowing the search of passenger compartments, even if the arrestee did not have access to the passenger compartment at that time.

¶ 24. In *State v. Fry*, this court addressed the question of "whether the search of the locked glove

---

[8] *See also United States v. Davis*, 598 F.3d 1259, 1262 (11th Cir. 2010) ("We, like most other courts, had read *Belton* to mean that police could search a vehicle incident to a recent occupant's arrest regardless of the occupant's actual control over the passenger compartment."); *United States v. McCane*, 573 F.3d 1037, 1041 (10th Cir. 2009) ("Tenth Circuit precedent anteceding *Gant* was not an exception" to the generally accepted reading of *Belton*.).

compartment of the defendant's automobile after his arrest . . . was justified as a search incident to an arrest." 131 Wis. 2d at 156. In *Fry,* we read *Belton* as "deciding that the interior of an automobile 'is an area into which an arrestee might reach in order to grab a weapon or evidentiary item,' even when the defendant is not in the automobile during the search." *Id.* at 167 (citations omitted) (quoting *Belton,* 453 U.S. at 460). Relying on *Belton,* we concluded that the search did not violate Wis. Stat. § 968.11, the Wisconsin Constitution, or the United States Constitution because the officers "limited the search to the passenger compartment of [the defendant's] automobile, which *Belton* holds is within the acceptable area of a search incident to arrest." *Id.* at 170. We explicitly adopted our understanding of *Belton* as the proper interpretation of the Wisconsin Constitution in order to keep the federal and state constitutional protections consistent. *Id.* at 174–76. We also described *Belton* as a reasonable and workable bright-line rule that would provide clear direction for the police. *Id.* We construed *Belton* to hold that all closed containers in an automobile, whether locked or unlocked, may be searched incident to a lawful arrest while the defendant is at the arrest scene.[9] *Id.* at 178–80.

¶ 25. After *Fry,* the law in Wisconsin was clear: following a lawful arrest, police may search the contents of an automobile while the defendant is at the scene without running afoul of Wis. Stat. § 986.11, Article 1, Section 11 of the Wisconsin Constitution, or the Fourth Amendment to the United States Constitu-

---

[9] The dissent in *Fry* would have given greater protections under Wis. Stat. § 986.11 and the Wisconsin Constitution; it rejected what it called the "*Belton* rule." *State v. Fry,* 131 Wis. 2d 153, 186–88, 388 N.W.2d 565 (1986) (Bablitch, J., dissenting).

tion, whether or not the area searched was actually accessible to the arrestee. Subsequent Wisconsin cases were consistent in their reliance on *Fry*'s articulation of the *Belton* rule. *See Pallone,* 236 Wis. 2d 162, ¶ 35 (explaining that under *Belton* and *Fry,* police may search a vehicle incident to arrest even though the defendants lacked the ability to access the interior of the vehicle due to their arrest); *State v. Murdock,* 155 Wis. 2d 217, 231–34, 455 N.W.2d 618 (1990) (same); *Littlejohn,* 307 Wis. 2d 477, ¶¶ 8–11 (same).

¶ 26. In *Arizona v. Gant,* 129 S. Ct. 1710 (2009), the United States Supreme Court rejected the prevailing interpretation of *Belton*—the interpretation we adopted in *Fry.* A "broad reading" of *Belton,* the Court explained, would "untether the rule from the justifications underlying the *Chimel* exception." *Id.* at 1719. Thus, the Court held "that the *Chimel* rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id.* The Court went beyond *Chimel* and further held "that circumstances unique to the vehicle context justify a search [of an otherwise inaccessible vehicle] incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' " *Id.*

¶ 27. *Gant,* then, is a clear break from *Fry* and its progeny. Consistent with our prior practice of keeping Wisconsin and federal constitutional law in this area in step, we hereby adopt the reasoning in *Gant* as the proper reading of Article 1, Section 11 of the Wisconsin Constitution (protecting against unreasonable searches and seizures). *Fry* and any decisions relying on *Fry*'s

interpretation of the *Belton* rule are overruled. Under both the Wisconsin and United States Constitutions, the *Chimel* rationale authorizes a vehicular search only if the person arrested is unsecured and within reaching distance of the passenger compartment at the time of the search. However, a search incident to a lawful arrest may be justified when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant,* 129 S. Ct. at 1719 (citing *Thornton v. United States,* 541 U.S. 615, 632 (2004) (Scalia, J., concurring in the judgment)).

¶ 28. In this case, Dearborn locked the door to his truck and was in custody at the time the officers performed the search of his truck incident to his arrest. Under *Fry* and *Pallone,* the search the officers conducted on Dearborn's truck was clearly lawful. The officers therefore acted in objectively reasonable reliance on clear and settled Wisconsin Supreme Court precedent.

¶ 29. However, after *Gant,* as both parties recognize, we now know that the search of Dearborn's truck was a violation of Dearborn's constitutional rights. This is so because Dearborn was secured and therefore unable to reach the passenger compartment of his vehicle at the time of the search. Moreover, Dearborn's search cannot be upheld under *Gant* on the grounds that relevant evidence might be found in the truck, because the warden could not have reasonably expected to find evidence in the vehicle regarding Dearborn's revoked license.

B. The Good Faith Exception to the Exclusionary Rule

¶ 30. Dearborn argues that because the search here was unlawful, the evidence obtained as a result of

the illegal search should be suppressed under the exclusionary rule. The State asserts that because the officers relied in good faith on Wisconsin law as it stood at the time of the search, the good faith exception to the exclusionary rule should apply. This case, then, concerns the tension between two principles.

¶ 31. The first principle is the retroactivity rule, which states that newly declared constitutional rules must apply "to all similar cases pending on direct review." *Griffith v. Kentucky,* 479 U.S. 314, 322–23 (1987); *see also United States v. Johnson,* 457 U.S. 537, 562 (1982) (holding that a decision of the Supreme Court "construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered"). This rule accords with "basic norms of constitutional adjudication" and contains "no exception for cases in which the new rule constitutes a 'clear break' with the past." *Griffith,* 479 U.S. at 322, 328 (1987).

¶ 32. Applying the retroactivity rule here means that even though the search the officers conducted in this case was done in accordance with the law as declared at the time of the search, we are still required to hold that the search of Dearborn's truck was unconstitutional. In other words, the retroactivity rule means that Dearborn gets the benefit of the *Gant* holding because his case was not yet final.[10]

[10] Chief Justice Abrahamson argues that *Griffith* compels application of exclusion here. *See* dissent, ¶¶ 67–73. The United States Supreme Court disagrees with her. *See Illinois v. Krull,* 480 U.S. 340, 369–70 (1987) (O'Connor, J., dissenting); *infra* ¶¶ 40–42.

¶ 33. The second competing principle at work here is the application of the proper remedy for the constitutional violation—specifically, the exclusionary rule and the good faith exception to the exclusionary rule. Broadly defined, the exclusionary rule is not applied when the officers conducting an illegal search "acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *United States v. Leon,* 468 U.S. 897, 918 (1984).

¶ 34. This court is not the first to attempt a reconciliation of these two principles. Numerous cases have been filed around the country in the wake of *Gant* raising precisely this same question. The results have been mixed. Some courts have determined that the remedy of exclusion should be applied in all cases where the retroactivity rule applies,[11] while other courts agree with our conclusion that the exclusionary rule should not apply where the officers relied in good faith on clear and settled law that was only subsequently changed.[12]

¶ 35. We begin first with the exclusionary rule. The exclusionary rule is a judicially created remedy, not

---

The Chief Justice fails to appreciate the difference between a constitutional violation and a remedy for that violation. *See* dissent, ¶ 67 n.2. The retroactivity rule requires that we apply the newly announced rule to Dearborn—this means we must conclude that the search of his vehicle was unlawful. This is a distinct question, however, from whether the remedy of exclusion is warranted.

[11] *See, e.g., United States v. Gonzalez,* 578 F.3d 1130 (9th Cir. 2009); *State v. McCarty,* 229 P.3d 1041 (Colo. 2010).

[12] *See, e.g., United States v. Davis,* 598 F.3d 1259 (11th Cir. 2010); *United States v. McCane,* 573 F.3d 1037 (10th Cir. 2009); *State v. Baker,* 229 P.3d 650 (Utah 2010).

a right, and its application is restricted to cases where its remedial objectives will best be served. *Herring v. United States,* 129 S. Ct. 695, 700 (2009); *Arizona v. Evans,* 514 U.S. 1, 10–11 (1995). That means that just because a Fourth Amendment violation has occurred does not mean the exclusionary rule applies.[13] *Herring,* 129 S. Ct. at 700. Rather, exclusion is the last resort. *Id.* The application of the exclusionary rule should focus on its efficacy in deterring future Fourth Amendment violations. *Id.* Moreover, marginal deterrence is not enough to justify exclusion; "the benefits of deterrence must outweigh the costs." *Id.*

¶ 36. In *Herring,* decided just last year, the United States Supreme Court reaffirmed *Leon's* holding that the exclusionary rule should not apply when the police act in good faith, or in "objectively reasonable reliance" on a subsequently invalidated search warrant. *Id.* at 701. The Court clarified when the exclusionary rule should apply:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Id.* at 702. The test of whether the officers' reliance was reasonable is an objective one, querying " 'whether a

---

[13] Much of Chief Justice Abrahamson's dissent rests on her fundamental disagreement with this most basic principle. She laments, for example, that our opinion "leaves an acknowledged constitutional violation unremedied." *See, e.g.,* dissent, ¶¶ 54, 66. That is true; but it is true whenever the remedy of exclusion is held to be inappropriate. Her quarrel is with the law, not with our reasoning.

reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.' " *Id.* at 703 (quoting *Leon,* 468 U.S. at 922 n.23).

¶ 37. This court adopted the good faith exception to the exclusionary rule in *State v. Ward,* 2000 WI 3, 231 Wis. 2d 723, 604 N.W.2d 517 (applying the exception to objectively reasonable reliance on settled law subsequently overruled), and affirmed the principles of *Leon* in *Eason,* 245 Wis. 2d 206 (applying the exception to objectively reasonable reliance on a warrant subsequently invalidated). Citing *Leon, Eason* held that the exclusionary rule cannot deter objectively reasonable law enforcement activity, and therefore it should not apply in those circumstances.[14] *Id.,* ¶ 73.

¶ 38. In sum, the exclusionary rule should be applied as a remedy to deter police misconduct and most appropriately when the deterrent benefits outweigh the substantial costs to the truth-seeking and law enforcement objectives of the criminal justice system.

¶ 39. The exclusionary rule's tension with the retroactivity rule that lies at the heart of this case has already been addressed by both the United States Supreme Court and this court.

---

[14] Chief Justice Abrahamson has never liked the good-faith exception to the exclusionary rule. *See State v. Ward,* 2000 WI 3, ¶¶ 64–91, 231 Wis. 2d 723, 604 N.W.2d 517 (Abrahamson, C.J., dissenting); *State v. Eason,* 2001 WI 98, ¶¶ 76–100, 245 Wis. 2d 206, 629 N.W.2d 625 (Abrahamson, C.J., dissenting).

She obviously prefers the law as it stood in 1923 following this court's decision in *State v. Hoyer,* 180 Wis. 407, 193 N.W. 89 (1923). Dissent, ¶¶ 80–82. That decision, however, does not reflect the current state of the law.

¶ 40. In *Illinois v. Krull,* 480 U.S. 340 (1987), the Illinois Supreme Court had ruled that a statute authorizing warrantless administrative searches violated the Fourth Amendment. *Id.* at 345–46. The court also suppressed evidence seized during a search conducted under the later-invalidated statute. *Id.* at 346. The United States Supreme Court granted certiorari to determine whether the good faith exception to the exclusionary rule should preclude suppression where the officers acted in objectively reasonable reliance upon the statute. *Id.* at 342.

¶ 41. The United States Supreme Court began its analysis by pointing to the "prime purpose" of the exclusionary rule: deterrence of unlawful police conduct. *Id.* at 347 (quoting *United States v. Calandra,* 414 U.S. 338, 347 (1974)). It noted that the exclusionary rule is a judicial remedy, not a constitutional right of the aggrieved party. *Id.* The Court said that applying the exclusionary rule when the police officers acted in objectively reasonable reliance on a statute would have virtually no deterrent effect. *Id.* at 349–50. It would make no sense, the Court explained, to punish the officers for the legislature's error. *Id.* at 350. Because the officers' reliance on binding law was objectively reasonable and in good faith, the good faith exception to the exclusionary rule applied. *Id.* at 358–60.

¶ 42. *Krull* was a close case, with four members of the United States Supreme Court dissenting. *Id.* at 361. The dissent argued that the result in this case was directly at odds with the retroactivity rule announced in *Griffith. Id.* at 368 (O'Connor, J., dissenting). By failing to apply the exclusionary rule, "no effective remedy is to be provided in the very case in which the statute at issue was held unconstitutional." *Id.* Though recognizing that the exclusionary rule is a remedy not

always available when Fourth Amendment rights are violated, "the failure to apply the exclusionary rule in the very case in which a state statute is held to have violated the Fourth Amendment destroys all incentive on the part of individual criminal defendants to litigate the violation of their Fourth Amendment rights." *Id.* at 369. Such a precedent, the dissent maintained, will chill the development of Fourth Amendment principles.[15] *Id.*

¶ 43. Ten years ago, the Wisconsin Supreme Court relied on *Krull* for nearly the same proposition at issue in this case. In *Ward,* 231 Wis. 2d 723, this court allowed the admission of evidence obtained by officers acting in good faith reliance on clear case law that was subsequently changed by the United States Supreme Court. *Id.*, ¶ 3.[16] We concluded as follows: "[B]ecause the officers relied, in objective good faith, upon the pronouncements of this court we hold that exclusion of the evidence would serve no remedial objective and, therefore, the evidence seized at the Ward residence should be admitted."[17] *Id.*, ¶ 63. The dissent in *Ward* raised issues similar to those raised by the dissent in

[15] *Krull* was decided just three years after the delineation of the good faith exception announced in *Leon,* and the same year as the Court's resolution of the retroactivity issues in *Griffith.*

[16] The clear case law relied on by the police in *Ward* was this court's decision in *State v. Richards,* 201 Wis. 2d 845, 549 N.W.2d 218 (1996), which held that no-knock entries are always permitted when police execute a search warrant for felonious drug delivery. *Ward,* 231 Wis. 2d 723, ¶ 40. After the search warrant was executed and Ward pled no contest, but before Ward was sentenced, the United States Supreme Court overruled *Richards* in *Richards v. Wisconsin,* 520 U.S. 385 (1997). *See Ward,* 231 Wis. 2d 723, ¶ 16.

[17] The North Dakota Supreme Court reached the same result in *State v. Herrick,* 588 N.W.2d 847 (N.D. 1999).

*Krull* and argued by Dearborn in this case. It noted, "The majority opinion applies to any published decision of the court of appeals or this court authorizing a search when the decision is later declared unconstitutional." *Id.*, ¶ 88 (Abrahamson, C.J., dissenting). The dissent also questioned how this decision would affect the incentives for an accused to challenge a search explicitly authorized by law. *Id.*

¶ 44. We can find no principled way to distinguish *Krull* or *Ward* from this case.[18] Both this court and the United States Supreme Court have determined that the retroactivity rule does not bar application of the good faith exception in situations where police act in objectively reasonable reliance on settled (albeit subsequently overruled) law. As we have already explained, the officers were following the clear and settled precedent of this court; this is exactly what officers *should* do. Application of the exclusionary rule would have absolutely no deterrent effect on officer misconduct, while at the same time coming with the cost of allowing evidence of wrongdoing to be excluded. In short, under *Krull* and *Ward,* it is clear that applying the exclusionary rule would be an inappropriate remedy for the constitutional violations here.

¶ 45. We are not unmindful of the impact of the retroactivity doctrine. As the dissents in *Krull* and *Ward* recognized, the real cost to not applying the

---

[18] Chief Justice Abrahamson asserts that she can distinguish these cases, but we can find no discernible principle emerging from her writing. *See* dissent, ¶ 96. Her argument appears to boil down to attempts at factual distinctions without a difference. *Ward* in particular is a mirror image of this case. But it does not uphold Chief Justice Abrahamson's vision for the exclusionary rule, and thus, it appears she will not abide by its rule.

exclusionary rule when the law has been changed is that litigants may have less incentive to challenge potentially unconstitutional searches. *See Krull,* 480 U.S. at 369 (O'Connor, J., dissenting); *Ward,* 231 Wis. 2d 723, ¶ 88 (Abrahamson, C.J., dissenting). But these concerns are misplaced for at least three reasons.

¶ 46. First, under our holding today, the exclusionary rule is inappropriate only when the officer reasonably relies on clear and settled precedent. Our holding does not affect the vast majority of cases where neither this court nor the United States Supreme Court have spoken with specificity in a particular fact situation. The only litigants who will be disincentivized are the relatively small number of defendants who choose to challenge searches that have already clearly and unequivocally been held lawful. The vast majority of cases, particularly in the fact-intensive Fourth Amendment context, will not fall into this category. Moreover, we suspect that litigants are already hesitant to challenge well-settled precedent; such challenges are usually time-consuming and not worth the effort. Additionally, litigants will often feel like the facts of their case are slightly different and not squarely under the authority of settled case law. Even Dearborn in this case alleges that the search of his truck was unconstitutional under Wisconsin law before *Gant,* an assertion we reject for the reasons noted above.

¶ 47. Second, criminal defendants will still want to do whatever they can to increase their chances for success. It seems unlikely that convicted defendants will give up a fight to secure their freedom merely because the possibility of a material change in their conviction is low, or maybe after this case, somewhat lower.

¶ 48. Finally, criminal defendants are represented by a dedicated group of public defenders and private attorneys who genuinely care about the development of the law. Time and time again we have seen criminal defense attorneys take cases to this court, often without pay, in order to effect a particular change in the law. We doubt that our holding in this case will change this practice.

¶ 49. In sum, we are persuaded that the benefits of applying the exclusionary rule in this case are exceedingly low. The deterrent effect on officer misconduct, which is the most important factor in our analysis, would be nonexistent. For this reason, we conclude that the good faith exception to the exclusionary rule should preclude the suppression of the illegally obtained evidence in this case because the officers reasonably relied on clear and settled Wisconsin Supreme Court precedent in carrying out the search.

## IV. CONCLUSION

¶ 50. Prior to the United States Supreme Court's decision in *Gant,* this court made clear in *State v. Fry* and its progeny that the type of search conducted of Dearborn's truck following his arrest was lawful. However, we now accept *Gant*'s interpretation of the United States Constitution and adopt its holding as the proper interpretation of the Wisconsin Constitution's protection against unreasonable searches and seizures. Thus, the search of Dearborn's truck violated his constitutional rights.

¶ 51. However, we decline to apply the remedy of exclusion for the constitutional violation. We hold that the good faith exception precludes application of the exclusionary rule where officers conduct a search in

objectively reasonable reliance upon clear and settled Wisconsin precedent that is later deemed unconstitutional by the United States Supreme Court. Accordingly, we affirm the court of appeals and uphold Dearborn's conviction.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 52. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I agree that under *Arizona v. Gant,* 129 S. Ct. 1710 (2009), the search of the defendant's vehicle in this case violated the Fourth Amendment. I disagree with the majority's conclusion that the evidence obtained as a result of this unconstitutional search may nevertheless be admitted against the defendant under the doctrine of "good faith."

¶ 53. This case presents a real tension in the law and requires looking closely at the reasoning behind the two competing doctrines, the "retroactivity rule" of criminal procedure and the doctrine of "good faith" reliance under the Fourth Amendment.[1] I do not pretend the resolution of the tension is easy, but in my view, the majority has looked carefully at only one side of the dilemma and in so doing has reached the wrong result.

¶ 54. The majority disobeys controlling precedent, leaves an acknowledged constitutional violation unremedied, allows the law to provide different results for similarly situated defendants, and establishes a serious imbalance in how future Fourth Amendment issues will be brought to the courts and resolved. Given

---

[1] "Good faith" may also arise under the Wisconsin Constitution's protection against unreasonable search and seizures. *See State v. Eason,* 2001 WI 98, 245 Wis. 2d 206, 629 N.W.2d 625.

the slight weight afforded these consequences by the majority, it is no wonder the majority fails to weigh the costs to judicial integrity and the integrity of judicial process, values which our court has protected through the exclusionary rule for over 80 years.

¶ 55. Because I weigh these negative consequences more heavily than the majority has done, and because I decline to view judicial integrity as a dead letter, I dissent.

¶ 56. My discussion proceeds in four steps:

¶ 57. First, the majority effectively disregards the controlling rule of retroactivity under *Griffith v. Kentucky,* 479 U.S. 314 (1987), leaving unremedied a violation of a defendant's constitutional rights and establishing a system of inequitable adjudication for criminal defendants in the position of the defendant here.

¶ 58. Second, I address the continuing value of judicial integrity and its importance in deciding the present case. The majority does not assess the weight of judicial integrity in resolving the present case.

¶ 59. Third, I address the imbalance which I (and others) anticipate the majority's decision will create in how future cases determining Fourth Amendment boundaries will be raised and resolved. The majority acknowledges but understates these consequences, which will likely reach well beyond the particular set of cases to be decided under *Arizona v. Gant.*

¶ 60. Fourth, I distinguish the cases which the majority asserts cannot be distinguished and which the majority seems to argue control the outcome here.

¶ 61. Make no mistake. The majority's result is not dictated by precedent but runs against it. The court has to make a choice in the present case: to permit or to suppress unconstitutionally obtained evidence in court.

279

The majority acknowledges that its decision in this case comes down to weighing the costs and benefits. *See* majority op., ¶¶ 38, 44. In my view, the majority has bypassed key precedent and miscalculated the costs and benefits that drive its decision.

I

¶ 62. The majority's result admits a constitutional violation but declines to provide a remedy. In so doing, it tolerates a situation in this and future cases in which one defendant receives protection for a constitutional right while other defendants, by virtue of luck or timing, are denied the same protection for the same right.

¶ 63. The majority asserts that "the real cost" of admitting the unlawfully gained evidence in this case and others like it is "that litigants may have less incentive to challenge potentially unconstitutional searches." Majority op., ¶ 45. In other words, from the majority's point of view, the principal if not the only problem with admitting the evidence here is that it will come at some cost to the process of future law development. I disagree and further discuss this issue in part III below. However, before moving to that rather lawyerly discussion, I note that there are at least two more obvious and more direct "costs" that the majority has not tallied among the detriments of its decision.

¶ 64. First, the majority concludes that the defendant's Fourth Amendment rights were violated but declines to provide a remedy for that violation. Majority op., ¶¶ 50–51. The majority apparently does not count leaving unremedied a violation of a defendant's constitutional rights as a negative impact or cost of today's decision. I do, and so does the United States Supreme Court.

¶ 65. In *Arizona v. Gant,* where the defendant's rights were similarly violated, the United States Supreme Court noted that police misapprehension of the constitution in searches incident to arrest "does not establish the sort of reliance interest that could outweigh the countervailing interest that all individuals share in having their constitutional rights fully protected." 129 S. Ct. at 1723.

¶ 66. Second, today's decision effectively allows for selective protection of constitutional rights. Under the majority's decision, an exclusionary remedy vindicates the constitutional right of the one defendant lucky enough to reach the United States Supreme Court (here, the defendant in *Arizona v. Gant*). Yet other defendants, such as the defendant in the present case, who had the same right violated in the same way are denied the very same relief. The protection of constitutional rights should not fall to the luck of the draw.

¶ 67. The United States Supreme Court ruled in *Griffith v. Kentucky,* 479 U.S. 314, 322 (1987), that this differential treatment "violates basic norms of constitutional adjudication."[2] To guard against such a violation,

---

[2] The majority opinion quotes this language from *Griffith,* but carefully eliminates the word "violates." Majority op., ¶ 31. Inscrutably, the majority first acknowledges that "the retroactivity rule means that Dearborn gets the benefit of the *Gant* holding," majority op., ¶ 32, but then does not give Dearborn that benefit.

*See also United States. v. Johnson,* 457 U.S. 537 (1982). Preceding *Griffith,* the *Johnson* court held that, "subject to [certain] exceptions . . . , a decision of [the Supreme Court] construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered." 457 U.S. at 562. The United States Supreme Court did not acknowledge good faith as one such exception.

the *Griffith* court established a clear-cut retroactivity rule, holding—as the majority acknowledges—that a newly declared constitutional rule must apply to "all similar cases pending on direct review." 479 U.S. at 322–23. The *Griffith* court took a harsh stance on exceptions to this retroactivity principle, declining to recognize an "exception for cases in which the new rule constitutes a 'clear break' with the past" and instead holding that "*a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final . . . .*" 479 U.S. at 328 (emphasis added).

¶ 68. By making an exception to the retroactivity rule for "good faith," the majority's decision flatly violates *Griffith*.

¶ 69. The reasons for enforcing this "retroactivity rule" implicate fundamental values of judicial process and our legal system: Courts should not render advisory opinions, and similarly situated defendants should be treated alike.

¶ 70. *Griffith* emphasized, first, that if courts announce their "best understanding" of constitutional principles but then choose not to apply those principles to the resolution of pending cases, "the Court's assertion of power to disregard current law . . . is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation."

> [F]ailure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication . . . . [T]he nature of judicial review requires that we adjudicate specific cases, and each case usually becomes the vehicle for announcement of a new rule. But after we have decided a new rule in the case selected, the integrity of judicial

review requires that we apply that rule to all similar cases pending on direct review. Justice Harlan observed:

"If we do not resolve all cases before us on direct review in light of our best understanding of governing constitutional principles, it is difficult to see why we should so adjudicate any case at all . . . . In truth, the Court's assertion of power to disregard current law in adjudicating cases before us that have not already run the full course of appellate review, is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation."

*Griffith v. Kentucky,* 479 U.S. 314, 322–23 (1987) (internal citations omitted).

¶ 71. The second fundamental reason for applying the retroactivity rule, as *Griffith* explained, is to avoid the "actual inequity" of "fishing one case from the stream" while allowing other defendants to "flow by unaffected" by the proper interpretation of the constitution:.

[W]e fulfill our judicial responsibility by instructing the lower courts to apply the new rule retroactively to cases not yet final. Thus, it is the nature of judicial review that precludes us from "[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule."

. . . .

[S]elective application of new rules violates the principle of treating similarly situated defendants the same. . . . [T]he problem with not applying new rules to cases pending on direct review is "the *actual inequity* that results when the Court chooses which of many similarly situated defendants should be the chance beneficiary" of a new rule.

283

*Griffith v. Kentucky,* 479 U.S. 314, 323 (1987) (internal citations omitted) (emphasis in original).

¶ 72. The majority thus disregards a direct holding of the United States Supreme Court by applying a "good faith" exception to the retroactivity rule.[3] In so doing, the majority flouts the rationale for retroactivity, permitting in the present case the *"actual inequity"* against which the retroactivity rule protects.

¶ 73. The majority's reasoning is driven by the exclusionary rule and focuses on potential deterrence of police misconduct. *See* majority op., ¶¶ 35–38. This reasoning provides no real answer to the reasons why the United States Supreme Court has made the retroactivity rule the law of the land. Acknowledging that the exclusionary rule is considered a remedy, rather than a right, still provides no basis either for courts to

---

[3] Not surprisingly, in choosing not to follow the Griffith holding, the majority gives short shrift to that case. *See* majority op., ¶¶ 31, 42. Rather than provide reasons why the obligatory and categorically stated retroactivity rule does not apply here, the majority instead offers reasons why the good faith exception to the exclusionary rule should apply.

The majority's election not to follow the clear rule of *Griffith* may be startling, since by its own terms, *Griffith* is binding on "all cases, state or federal," while the majority acknowledges that application of the exclusionary rule is a matter of judicial policy, that is, a remedy that turns on a balancing of costs and benefits and that this court may decide is either warranted or not in a case. *See* majority op., ¶¶ 35–38; *see also State v. Ward,* 2000 WI 3, ¶ 48, 231 Wis. 2d 723, 604 N.W.2d 517 ("Whether the purpose of the exclusionary rule is solely remedial or also a matter of judicial integrity, the Supreme Court has made clear that for Fourth Amendment purposes 'the policies behind the exclusionary rule are not absolute. Rather, they must be evaluated in light of competing policies.' " (quoted source omitted)).

dole out the remedy inequitably or to pronounce the boundaries of the Fourth Amendment right in an advisory fashion. *Griffith* applies to *"rule[s]* for the conduct of criminal prosecutions," 479 U.S. at 328. The majority gives no reason the exclusionary rule should be treated differently.

## II

¶ 74. The majority does not evaluate the costs to judicial integrity in this case, thus placing no weight on judicial integrity. I cannot agree with this omission. I continue to value judicial integrity, as do a long line of prior and continuing cases evaluating the exclusionary rule. Moreover, I believe that judicial integrity is a concept that encompasses something more significant than simply prognosticating the likely effects of court decisions on future police behavior. The majority has made two key mistakes regarding judicial integrity.

¶ 75. First, while the majority acknowledges that proper resolution of this case requires squaring the retroactivity rule with the exclusionary rule, the majority does not assess the costs to judicial integrity and the judicial process, which the retroactivity rule protects. In my view, these costs to judicial integrity are no less weighty than the deterrence rationale, which the majority treats as the only required analysis.

¶ 76. As explained above, the "judicial integrity" values protected by the *Griffith* retroactivity rule are not merely another phraseology for Fourth Amendment deterrence. Rather, the retroactivity rule protects "basic norms of constitutional adjudication," curtails the "assertion that our constitutional function is . . . in effect [one] of legislation," preserves "the nature of judicial review" and guards against "actual inequity." *Griffith v.*

*Kentucky,* 479 U.S. at 322–23 (*see supra* ¶¶ 16–19). The majority's decision that retroactivity will not apply comes at a cost to these judicial values. The *Gant* decision is not given effect and this defendant is denied a remedy when others similarly situated receive one.[4]

¶ 77. Thus when the majority fails to factor judicial integrity into its resolution of the present case, it continues to view the tension in this case only from the perspective of the body of law which it prefers regarding the exclusionary rule. The majority thereby does not actually resolve "the tension between two principles," which it acknowledges and which the majority admits can be resolved in more than one way.[5]

¶ 78. Second, the majority has not acknowledged the traditional role of judicial integrity in exclusionary rule analysis. Wisconsin courts have long recognized, and continue to recognize, that suppression is necessary in some cases "to preserve the integrity of the judicial process," even in cases where no reasonable fault can be attributed to law enforcement officers. *State v. Hess,* 2010 WI 82, ¶¶ 64–67, 70, ___ Wis. 2d ___, 785 N.W.2d 568; *see also State v. Artic,* 2010 WI 83, ¶ 65, 327 Wis. 2d 392, 786 N.W.2d 430; *State v. Knapp,* 2005 WI 127, ¶ 79, 285 Wis. 2d 86, 700 N.W.2d 899 ("aside from deterring police misconduct, there is another fundamental reason for excluding the evidence under circumstances present here, the preservation of

---

[4] As the majority acknowledges, different jurisdictions have already divided in their resolutions of the tension between the retroactivity rule and the "good faith" exception to the exclusionary rule. The result is that defendants in Wisconsin will be denied a remedy available in other jurisdictions.

[5] *See* majority op., ¶ 30, ¶ 34 (acknowledging that other courts have reached divided results in resolving the tension between the retroactivity rule and the exclusionary rule).

judicial integrity"); *State v. Ward,* 2000 WI 3, ¶ 49, 231 Wis. 2d 723, 604 N.W.2d 517 ("we do not believe that . . . judicial integrity is sullied by admission of the evidence").[6]

¶ 79. Thus the majority is squarely at odds with the past and present holdings of this court when it simply ignores this additional analysis relevant to exclusionary rule analysis. In my view, each case requires an examination to determine whether judicial integrity is merely another aspect of deterrence, as may have been true in the exclusionary rule cases cited by the majority,[7] or whether the integrity of judicial values and judicial processes provides a separate and valid reason for excluding unlawfully-obtained evidence, given the stakes raised in the particular case.

¶ 80. The majority apparently forgets that Wisconsin adopted the exclusionary rule to effectuate Article 1, Section 11 of the Wisconsin Constitution long before *Mapp v. Ohio,* 367 U.S. 643 (1961), made the federal courts' interpretation of the exclusionary rule binding in state courts as a matter of federal law. In

---

[6] Other authorities have also traditionally treated judicial integrity as a rationale that is distinct and separate from deterrence: "The deterrence of unreasonable searches and seizures is a major purpose of the exclusionary rule. . . . But the rule serves other purposes as well. There is for example, . . . 'the imperative of judicial integrity,' namely, that the courts do not become 'accomplices in willful disobedience of a Constitution they are sworn to uphold.'" Black's Law Dictionary (8th ed. 2004), exclusionary rule (quoting Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 3.1, at 107 (2d ed. 1992)).

[7] *See State v. Hess,* 2010 WI 82, ¶ 65, ___ Wis. 2d ___, 785 N.W.2d 568 ("These cases [*Herring*] and [*Evans*] simply refused to exclude evidence based on judicial integrity in the specific facts of those cases.").

1923 this court decided *State v. Hoyer,* "a watershed in Wisconsin law." *State v. Orta,* 2000 WI 4, ¶ 7, 231 Wis. 2d 782, 786, 604 N.W.2d 543. *Hoyer* adopted the exclusionary rule as the law of Wisconsin, for reasons that were in no way limited to deterrence. The *Hoyer* court wrote:

> We see no reason in logic, justice, or in that innate sense of fair play, which lies at the foundation of such guaranties, why a court of justice, rejecting as abhorrent the idea of the use of evidence extorted by violation of a defendant's right to be secure in person and exempt from self-incrimination, though it may result in murder going unwhipt of justice, should yet approve of the use, in the same court of justice, by state officers, of that which has been obtained by other state officers through, and by a plain violation of constitutional guarantees of equal standing and value, though thereby possibly a violation of the prohibition law may go unpunished.
>
> Section 11, art. 1, Wis. Const., supra, is a pledge of the faith of the state government that the people of the state . . . shall be secure in their persons, houses, papers, and effects against unreasonable search and seizure. This security has vanished, and the pledge is violated by the state that guarantees it, when officers of state, acting under color of state given authority, search and seize unlawfully. The pledge of this provision and of section 8 are each violated when use is made of such evidence in one of its own courts by other of its officers. That a proper result—that is, a conviction of one really guilty of an offense—may be thus reached is neither an excuse for, nor a condonation of, the use by the state of that which is so the result of its own violation of its own fundamental charter. Such a cynical indifference to the state's obligations should not be judicial policy.

*State v. Hoyer,* 180 Wis. 407, 417, 193 N.W. 89 (1923).

¶ 81. The weight of *Hoyer* and its bearing on the emergence and rapid expansion of a good faith exception in Wisconsin was well articulated by Justice

Prosser in his concurring opinion in *State v. Orta,* 2000 WI 4, ¶¶ 6–15, 231 Wis. 2d 782, 791, 604 N.W.2d 543, 548, concluding that "[i]t may be possible to support a limited good faith exception to the exclusionary rule in a worthy case, with compelling facts, in which the court carefully articulates a rationale that squares with the storied *Hoyer* decision. But not in *Ward* and not here."[8] When this court last expanded the doctrine of "good faith" exceptions to the exclusionary rule in *State v. Eason,* 2001 WI 98, 245 Wis. 2d 206, 629 N.W.2d 625, it discussed *Hoyer* at length and adopted a good faith exception bottomed on the Wisconsin constitution, a rule that is more protective of individual rights than the rule applied by the federal courts.[9]

---

[8] *See also Ward,* 231 Wis. 2d 723, ¶ 87 (Abrahamson, C.J., dissenting) ("[*Hoyer*] demonstrates this state's commitment to protecting the privacy of its citizens which this court should not rush to diminish.")

[9] *See also Eason,* 245 Wis. 2d 206, ¶ 94 (Abrahamson, C.J., dissenting) ("I do not question the majority's conclusion that a good faith exception to the exclusionary rule does not alter officers' incentives to comply with the Fourth Amendment. But what about the incentives for the other persons in the system? The majority is silent about the potential effects on issuing magistrates. The majority is silent about the potential effects on prosecutors. The majority is silent about the potential effects on public confidence in a justice system that not only allows constitutional violations to go unaddressed, but also uses the fruits of those constitutional violations to convict those whose constitutional rights have been violated. Our justice system can do better. Our justice system has done better in the seventy-seven years since the Wisconsin Supreme Court first recognized the exclusionary rule."); *Id.,* ¶ 101 (Prosser, J., dissenting) ("Because the small gain that may come out of this sea change in our law does not outweigh the potential loss of liberty to our citizens, and because this case offers a feeble excuse to make such a far-reaching change, I respectfully dissent").

¶ 82. Thus the majority falls short when it fails to analyze judicial integrity, an established rationale for suppressing unconstitutionally obtained evidence from use in Wisconsin courts. The majority errs when it fails to take up the invitation to square its rationale with *Hoyer* or more generally with Wisconsin's independent case law governing the exclusionary rule and the role of judicial integrity in its application.[10]

### III

¶ 83. Having first bypassed application of the retroactivity rule and the norms it protects, and then having dismissed the notion that judicial integrity has any weight in this case, the majority acknowledges and addresses only one "real cost"; namely, "that litigants may have less incentive to challenge potentially unconstitutional searches." Majority op., ¶ 45.

¶ 84. The majority understates the impact that allowing a "good faith" exception for reliance by police on judicial decisions will have on the continuing and meaningful role of courts in adjudicating Fourth Amendment cases and protecting the constitutional

---

[10] *See Ward,* 231 Wis. 2d 723, ¶ 58 ("[E]ven if our exclusionary rule were no more than a judicially created remedy, this Court would maintain the obligation to ensure that the remedy effectuates [state constitutional] rights." (quoting and adopting the statements of *State v. Oakes,* 598 A.2d 119, 121 (Vt. 1991); *id.,* ¶ 59 ("[I]t would be a sad irony for this court to exhort magistrates to act as something more than 'rubber stamps' when issuing warrants, and to then act as mere rubber stamps ourselves when interpreting our Wisconsin Constitution. It is our responsibility to examine the State Constitution independently. This duty exists even though our conclusions in a given case may not differ from those reached by the Supreme Court when it interprets the Fourth Amendment.").

right to be free from unreasonable searches and seizures. Having articulated deterrence as the primary if not exclusive rationale for the exclusionary rule, the majority then adopts an exception to the rule that dramatically undermines its deterrent effect.

¶ 85. The Honorable Lynn Adelman, a United States District Judge for the Eastern District of Wisconsin, wisely reminds us that "[i]f we as a nation care about our Constitution, judges must continue to define and develop its guarantees .... It is the province of the judicial branch to say what the law is today, and it must continue to do so if that document is to have meaning tomorrow."[11] However, judicial recognition of the good faith exception adopted by the majority will hamper the development of Fourth Amendment jurisprudence by eliminating the reason for defendants to bring constitutional challenges and by giving courts no occasion to clarify and articulate standards protective of Fourth Amendment rights.

¶ 86. These concerns were articulated by Justice O'Connor in *Illinois v. Krull,* 480 U.S. 340, 369 (1987), who wrote:

> [T]he failure to apply the exclusionary rule in the very case in which a state statute is held to have violated the Fourth Amendment destroys all incentive on the part of individual criminal defendants to litigate the violation of their Fourth Amendment rights. In my view, whatever "basic norms of constitutional adjudication" otherwise require, surely they mandate that a party appearing before the Court might conceivably benefit from a judgment in his favor. ... [T]he inevitable result of the

---

[11] Lynn Adelman & Jon Deitrich, *Saying What the Law Is: How Certain Legal Doctrines Impede the Development of Constitutional Law and What Courts Can Do About It,* 2 Fed. Cts. L. Rev. 87, 98 (2007).

Court's decision to deny the realistic possibility of an effective remedy to a party challenging statutes not yet declared unconstitutional is that a chill will fall upon enforcement and development of Fourth Amendment principles . . . .[12]

¶ 87. However prescient Justice O'Connor's articulation of these concerns with regard to the constitutional challenge to statutes, the concerns are much greater in extending a "good faith" exception to deny any meaningful remedy when the case law is later determined to be incorrect and unconstitutional.

¶ 88. The effect of the majority's new "good faith" exception will most likely be that courts will examine first whether the good faith exception applies, and if it does, will not determine whether a violation of the Fourth Amendment occurred. As one commentator explained:

Judicial recognition of a good faith exception to the fourth amendment exclusionary rule would be more than a simple refinement of remedy. The exception would serve as a well camouflaged and subtle attack upon the values and substantive meaning of the amendment itself. Courts rarely would articulate new search and seizure standards sensitive to fourth amendment interests because once a court found police good faith the constitutional determination would be irrelevant to the outcome of those very cases in which such articulation might take place. Insulated from the continuing pressure to decide new fourth amendment issues or dramatically review old ones, courts will lose the opportunity or incentive to set standards for future cases. Consequently, the disincentive to review new

[12] *Illinois v. Krull*, 480 U.S. 340, 369 (1987) (O'Connor, J., dissenting) (citing *Griffith*, 479 U.S. at 322).

fourth amendment issues will reduce significantly the exclusionary rule's ability to generally and systemically deter illegal police behavior.

Stanley Ingber, *Defending the Citadel: The Dangerous Attack of "Reasonable Good Faith"*, 36 Vand. L. Rev. 1511, 1579–80 (1983) (footnotes omitted).

¶ 89. As another commentator explains, the extension of the *Leon* good faith rule has hampered the continuing articulation of a standard for probable cause. "Knowing that it is unlikely that resolution of the probable cause issue will affect the admissibility of the evidence in question, courts commonly bypass probable cause and proceed directly to good faith. Indeed, some courts have flipped the two concepts and address good faith first as a matter of course."[13]

¶ 90. If the preliminary issue that the court addresses is whether a law enforcement officer was acting in good faith, "[w]hen a court finds the existence of such a [good faith] belief, the actual constitutionality of the officer's behavior . . . becomes irrelevant" and the need

---

[13] Adelman & Deitrich, *supra* note 11, at 89.

For a persuasive and informal articulation of the problem see Orin Kerr, *Good Faith Exception for Changing Law: Exclusionary Rule on Direct Appeal*, http://volokh.com/2010/03/02/ the-good-faith-exception-and-changing-law-the-benefit-of-the-exclusionary-rule-on-direct-appeal/ (last visited July 6, 2010). Professor Kerr explains that one result of disincentivizing criminal defendants from bringing hard cases on issues with courts divided around the country would be the creation of systemic imbalance in the development of Fourth Amendment rules. If Wisconsin adopts "clear and settled" precedent on a particular Fourth Amendment issue but other jurisdictions adopt different rules, the Wisconsin defendant has no reason to challenge the rule as unconstitutional because the State will simply be able to claim "good faith."

to refine Fourth Amendment doctrine is eliminated.[14] Thus, the unfortunate result of expanding the scope of the good faith exception is that courts that apply the exception will "tell us nothing about the requirements of the Fourth Amendment and often very little about the requirements of the good faith doctrine, and constitutional law stagnates accordingly." Adelman & Deitrich, 2 Fed. Cts. L. Rev. at 89. Indeed, if the good faith exception had been applied in *Arizona v. Gant*, that case almost certainly never would have been brought before the United States Supreme Court because the government could have claimed "good faith" reliance on *Belton*. The constitutional rule now articulated by *Gant* never would have been given effect.

¶ 91. The majority asserts three reasons to disregard this problem of stagnation. First, the majority claims that "the only litigants who will be disincentivized are the relatively small number of defendants who choose to challenge searches that have already clearly and unequivocally been held lawful." Majority op., ¶ 46. By acknowledging that the good faith exception affects only a small number of defendants, the majority also implicitly admits that the costs of applying the exclusionary rule would be low. Furthermore, the majority ignores the fact that this small group of litigants who are willing and in a position to challenge prevailing standards may be the most important group questioning whether the currently governing case law embodies a correct interpretation of the Fourth Amendment.

¶ 92. Second, the majority asserts that "criminal defendants will still want to do whatever they can to increase their chances for success" and will continue to

---

[14] Stanley Ingber, *Defending the Citadel: The Dangerous Attack of "Reasonable Good Faith"*, 36 Vand. L. Rev. 1511, 1557 (1983).

fight for their freedom despite the low probability of a material change in their conviction. Majority op., ¶ 47. That defendants may raise and argue claims does not mean that the courts will decide the Fourth Amendment issue if they can avoid it by deciding the case under "good faith."

¶ 93. Finally, the majority places its trust in a "dedicated group of public defenders and private attorneys who genuinely care about the development of the law" to continue to take cases to this court "in order to effect a particular change in the law." Majority op., ¶ 48.

¶ 94. The defendants' desire to fight for their freedom and the continuing efforts of dedicated lawyers do not address the issue of excusing the courts from articulating and developing Fourth Amendment law. Even if constitutional issues are consistently raised before the courts, the courts will have no opportunity to address the Fourth Amendment protections if the issue is effectively insulated by a "good faith" exception. Defendants will bring cases, but where "good faith" applies, that doctrine will resolve the issue unless courts become willing to render what amount to advisory opinions on Fourth Amendment issues not needed to decide the case.

IV

¶ 95. Neither *State v. Ward* nor *Illinois v. Krull* discussed the tension presented in this case, and neither provides persuasive or controlling reasons why in the present case the good faith exception to the exclusionary rule should control instead of the normal application of the retroactivity rule. The briefs in *Ward* did not argue the tension between the retroactivity rule and the exclusionary rule, and the opinion did not address it.[15]

---

[15] The majority contends that "the dissent in *Ward* raised issues similar to those raised by the dissent in *Krull*" and argued

¶ 96. The majority asserts that it can find no reason to distinguish this case from the *Ward* and *Krull* cases. There is a distinction. In *Ward* as in *Eason,* the seminal cases in which Wisconsin has recognized a "good faith" exception, the officers acted pursuant to a search warrant.[16] In *Krull* an Illinois statute specifically authorized the contested search without a warrant.[17] The majority lumps together good faith reliance on statutes, warrants, and judicial decisions as "situations where police act in objectively reasonable reliance on settled (albeit subsequently overruled) law," and declines to distinguish among them. Majority op., ¶ 44. In my view, and under our established law, the different sources of authority that may justify a police search need not be necessarily treated alike.

¶ 97. Searches conducted pursuant to a warrant differ fundamentally from searches conducted without a warrant but pursuant to one of the narrowly drawn exceptions that allow police to conduct a search without

in the present case. The cited portion of the dissent raises the point that the "good faith" reliance applied in Ward may arise from "any published decision of the court of appeals or this court." Neither the dissent nor the majority engaged the central issue in this case, which is not about what cases may give rise to "good faith" reliance but whether the "good faith" exception can trump the retroactivity rule for cases pending on direct appeal.

[16] *State v. Ward,* 2000 WI 3, ¶ 10, 231 Wis. 2d 723, 604 N.W.2d 517; (police acted with a warrant authorizing a no-knock entry; the court ultimately determined that "the evidence is admissible under the Wisconsin Constitution because the officers relied upon a rule established by this court" and did not address reliance on the warrant, ¶ 63 n.8).

[17] *See* majority op., ¶ 41 (discussing *Illinois v. Krull,* 480 U.S. 340, 345–46 (1987)).

a warrant.[18] "Search warrants are an essential safe-guard against government overreaching. They protect privacy in persons, houses, papers, and effects by requir-ing a neutral magistrate to make an independent deter-mination . . . before authorizing a government search." *State v. Ward,* 231 Wis. 2d 723, ¶ 93 (Prosser, J., dissent-ing).

¶ 98. There is a substantial difference between on the one hand recognizing "objective good faith" reliance where a neutral and detached judicial officer has re-viewed facts submitted in an affidavit to determine whether the constitution permits a search, and on the other hand extending "objective good faith" reliance to legal judgments made by police officers without the judicial check of the warrant process. "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and de-tached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 13–14 (1948). Thus the United States Supreme Court has never recognized the "good faith" exception to the exclusionary rule that the majority today extends "for reliance on prior holdings of its own from which it has subsequently departed, much less for reliance on the erroneous inter-pretations of its prior holdings by lower courts."[19]

---

[18] Whether the exceptions to the warrant requirement are actually "narrowly drawn" in practice or only in denomination is a slightly different and perhaps contested question. *See State v. Robinson,* 2010 WI 80, ¶ 54, 327 Wis. 2d 302, 786 N.W.2d 463 (Bradley, J., dissenting).

[19] *See People v. McCarty,* 229 P.3d 1041, 1044 (Colo. 2010):

¶ 99. As the majority explains, the holding in *Ward* was not by itself limited to reliance on an issuance of a warrant. *See Ward,* 231 Wis. 2d at 754, ¶ 62 ("law enforcement officers and magistrates must be allowed to reasonably rely upon the pronouncements of this court"). The *Ward* decision, however, also addressed the case before it, where a warrant was issued, and the court offered no discussion of the retroactivity rule.[20]

¶ 100. As the majority acknowledges, application of the exclusionary rule turns on a balancing of costs and benefits, forcing an inquiry of whether it is "worth

[T]he Court has created an exception for objective good-faith reliance on judicially-issued warrants, *see Leon,* 468 U.S. at 922, 104 S. Ct. 3405; *Massachusetts v. Sheppard,* 468 U.S. 981, 987–88, 104 S. Ct. 3424, 82 L. Ed. 2d 737 (1984); *see also Arizona v. Evans,* 514 U.S. 1, 16, 115 S. Ct. 1185, 131 L. Ed. 2d 34 (1995) (recognizing "a categorical exception to the exclusionary rule for clerical errors of court employees"); for certain kinds of Fourth Amendment violations in executing those warrants, *see Hudson v. Michigan,* 547 U.S. 586, 594, 126 S. Ct. 2159, 165 L. Ed. 2d 56 (2006) (violation of knock and announce rule); and even for sufficiently attenuated reliance on withdrawn judicial warrants that remained in the system due to executive branch negligence, see *Herring v. United States,* ___ U.S. ___, 129 S. Ct. 695, 698, 172 L. Ed. 2d 496 (2009). It has similarly recognized an exception for objective good-faith reliance on legislation, subsequently held to be unconstitutional, designating particular conduct criminal, *see Michigan v. DeFillippo,* 443 U.S. 31, 38, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979), or excusing the warrant requirement for non-criminal, administrative investigations, *see Illinois v. Krull,* 480 U.S. 340, 349–50, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987). It has thus far not, however, recognized a good-faith exception to the exclusionary rule for reliance on prior holdings of its own from which it has subsequently departed, much less for reliance on the erroneous interpretations of its prior holdings by lower courts.

[20] *Ward,* 231 Wis. 2d 723, ¶ 49 ("*In this case,* we do not believe that excluding the evidence seized by the police will serve any remedial objective, *or that judicial integrity is sullied by admission of the evidence*") (emphasis added).

298

the price paid by the justice system" to permit use of the evidence unlawfully obtained.[21] By contrast, the retroactivity rule is applied categorically, with "no exception for cases in which the new rule constitutes a 'clear break' with the past." *See* majority op., ¶ 31 (quoting *Griffith v. Kentucky,* 479 U.S. at 328). Nothing about the evaluation of costs and benefits "in light of competing policies"[22] in *Ward* necessarily controls the evaluation that the court must make in the present case.

¶ 101. Moreover, the "objective reasonable reliance" on precedent trumpeted by the majority is far more credible and easier to administer in a case like *Ward* where police acted with warrant in hand than in a case like the present one where police acted without a warrant.[23]

---

[21] *See* majority op., ¶ 36 (quoting *Herring,* 129 S. Ct. at 702).

As stated in *Herring,* the exclusionary rule balance generally turns on whether "exclusion can meaningfully deter" police misconduct and whether "such deterrence is worth the price paid by the justice system." *Herring* did not address benefits of exclusion other than deterrence of police misconduct. The majority follows the same approach in the present case. Because this case presents a situation where the exclusionary rule must be overtly reconciled with the retroactivity rule, the necessary balancing turns on a broader set of considerations, drawn from both of the competing doctrines.

[22] *Ward,* 231 Wis. 2d 723, ¶ 48.

[23] The Seventh Circuit Court of Appeals has clearly distinguished between "good faith" reliance on a search warrant and "good faith" reliance on police understanding and application of court decisions:

> We decline to extend further the applicability of the good-faith exception to evidence seized during law enforcement searches conducted in naked reliance upon subsequently overruled case law—as distinguished from the subsequently invalidated statute

¶ 102. The majority opens the door to a "good faith" exception in cases where police act on their own evaluation of the case law rather than in reliance on the evaluation of a neutral and detached magistrate. This raises a range of problems not presented by previously adopted "good faith" reliance on a warrant or a statute. Among them, the majority's standard of "objectively reasonable reliance upon clear and settled Wisconsin precedent" will raise an additional layer of judicial analysis probing the boundaries of what constitutes "objectively reasonable" and "clear and settled." This

---

at issue in *Krull*—absent magistrate approval by way of a search warrant. Such expansion of the good-faith exception would have undesirable, unintended consequences, principal among them being an implicit invitation to officers in the field to engage in the tasks—better left to the judiciary and members of the bar more generally—of legal research and analysis.

*United States v. Real Property Located at 15324 County Highway E.*, 332 F.3d 1070, 1076 (7th Cir. 2003).

Explaining the importance of the distinction between judicial and police evaluation of facts at greater length in the context of a probable cause determination, the Western District of Michigan reasoned:

The difficulties facing courts making probable cause determinations and interpreting case law, however, are small in comparison to those facing police officers. Officers are particularly poorly situated to determine whether the facts of a particular case establish probable cause to search because they lack "the detached scrutiny of a neutral magistrate." Indeed, the "judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime" is considerably less reliable than that of a neutral court. The expansions of the good-faith doctrine have shown that courts do not wish to entrust to the executive branch law enforcement the unilateral power to make probable cause determinations based on their own reading of case law.

*United States v. Peoples*, 668 F. Supp. 2d 1042, 1049 (W.D. Mich. 2009).

further round of litigation a degree removed from the substantive question of whether a Fourth Amendment violation took place could be avoided by our simple reliance on the command of *Griffith v. Kentucky.* We should hold that following the retroactivity rule, the constitutional right that was violated in the present case should be vindicated by the usual remedy of suppression.

## V

¶ 103. As I have demonstrated, and as *Griffith v. Kentucky* teaches, the controlling constitutional rule of retroactivity requires that the violation of the defendant's constitutional rights in the present case be remedied in order to avoid actual inequity. In resolving this case, the majority has ignored the fundamental importance of judicial integrity. The majority misplaces its reliance on prior decisions that are not controlling in resolving the tension between the retroactivity rule and the exclusionary rule and thus resolving the present case. Finally, the majority's acceptance of the good faith exception poses significant risks to the development of constitutional law in the state of Wisconsin.

¶ 104. I would not adopt the majority opinion's "good faith" exception to the exclusionary rule. I would apply the retroactivity rule of *Griffith v. Kentucky* to require that the evidence obtained in violation of the Fourth Amendment, as interpreted in *Arizona v. Gant,* should be suppressed in the present case.

¶ 105. Accordingly, I dissent.

¶ 106. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.