COURT OF APPEALS
DECISION
DATED AND FILED

February 3, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2024**

STATE OF WISCONSIN

Cir. Ct. No. 2024GN10

IN COURT OF APPEALS
DISTRICT III

IN THE MATTER OF THE CONDITION OF T.W.Z.:

BURNETT COUNTY,

    PETITIONER-RESPONDENT,

  V.

T. W. Z.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Burnett County: MELISSIA R. MOGEN, Judge. *Order affirmed in part and reversed in part; order affirmed; cause remanded with directions.*

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Trevor[1] appeals from orders granting Burnett County's petitions for guardianship of his person and estate and for his protective placement. We affirm in all but one respect: the County failed to prove by clear and convincing evidence that Trevor is incapable of understanding the objective of the elective process, and we therefore reverse that portion of the guardianship order declaring that Trevor has an incapacity to register to vote or to vote in an election. We remand with directions for the circuit court to reinstate that right in a manner consistent with WIS. STAT. § 54.25(2)(c)2. (2023-24).[2]

## BACKGROUND

¶2 In February 2024, Trevor, then 78 years old, was living in a shack-like structure made of plywood, where he had resided for several years. Due to his declining health, church members transported Trevor to the hospital. Hospital staff reported that Trevor arrived at the hospital "covered in dirt and feces" and that he had soiled clothing and sores on his skin. Hospital staff further noted that Trevor was dehydrated and "unable to clean himself."

¶3 Following Trevor's hospitalization, the Burnett County Health and Human Services Department (DHS) received a report from church members regarding Trevor's living conditions. After investigating the report, the DHS reported that Trevor's residence "had holes in the walls and the floor, and [the residence] was almost completely filled with wood, garbage, and human and cat waste." In addition, the DHS discovered that the residence had no running water

---

[1] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials.

[2] All references to the Wisconsin Statutes are to the 2023-24 version.

or plumbing, that Trevor was using a gas generator and wood-burning stove for heat, and that he was using a bucket inside of the residence as a toilet. The DHS also observed that the pillow Trevor used for sleeping had what was likely blood and/or feces on it. The DHS condemned the residence in late February 2024. After approximately one month in the hospital, Trevor was transferred to a continuing care center.

¶4 Thereafter, the County filed petitions for guardianship of Trevor's person and estate and for his protective placement. In support of the petitions, the County submitted an examination report completed by a physician, Dr. Timothy Novick.

¶5 The circuit court held a final hearing on May 29, 2024, to address the County's petitions. Novick, whose examination report was admitted into evidence without objection, testified that he cared for Trevor while he was in the hospital and met with him "on a daily basis." Novick explained that he examined Trevor as part of the guardianship petition in mid-February 2024 but that his opinions had not changed between the examination and the final hearing.[3] Novick added that, as part of the examination, he conducted a St. Louis University Mental Status (SLUMS) cognitive inventory test, which, according to Novick, is a "very standardized test." Novick stated that Trevor scored in the cognitively impaired range on the test, and he found that Trevor has a permanent developmental disability and degenerative brain disorder—namely, "moderate dementia."

---

[3] Novick stated that prior to and at the time of the hearing, he had scheduled meetings with Trevor at the continuing care center every 60 days as part of Trevor's treatment.

¶6    In Novick's opinion, Trevor "would deteriorate adversely if left to himself." In support of this finding, Novick cited Trevor's continued treatment for bed sores that he obtained while living independently and the fact that Trevor cannot cook or bathe himself. In addition, Novick noted that Trevor suffered from incontinence even after he was admitted to the hospital and transferred to the continuing care center. Novick also stated that "it's a wonder [Trevor] didn't get frostbite" or pneumonia "this last winter" from living in the shack-like structure. According to Novick, Trevor does not appreciate the fact that he is in poor health or that his bed sores are "a result of the way he was living."

¶7    Novick further expressed that Trevor could not prevent financial exploitation and that he was at risk of his property dissipating. Novick noted that the DHS discovered $3,000 in cash inside of a van on Trevor's property, and, according to Novick, Trevor "had no idea he had that money or where it was placed."

¶8    Novick additionally explained that no rehabilitation or training "would reverse [Trevor's] brain power to change the situation" and that Trevor does not have an appreciation of his impairment.

¶9    Novick recommended that Trevor be placed in a secure nursing home "where he can't wander off" and where he has care staff available to, for example, cook for him and bathe him. Novick stated that Trevor does not need assistance with all activities of daily living but that he "certainly needs help with his incontinence," "wound management," cooking, and diet. In addition, Novick explained that "maybe a group home would work, but it has to be a supervised living situation. It couldn't be like assisted living, where he has his own independence. I think it requires intensity of caretakers."

¶10    Kari Wojtysiak, a social worker for the DHS, testified to the conditions of Trevor's residence, and the County successfully moved to admit numerous photographs of the residence's interior and exterior into evidence. Wojtysiak stated that she believed Trevor's living conditions posed a danger to himself and that the DHS had condemned the residence because there was "no way to feasibly clean up the residence for [Trevor] to be able to safely move back there." Furthermore, Wojtysiak explained that the church members attempted to get Trevor to the hospital a week before his admission, but he refused to leave. She stated that the Burnett County Sheriff's Office conducted a "home visit" with Trevor shortly thereafter. Approximately one week later, Trevor "admitted he[ was] not feeling well and had the neighbors bring him to the emergency room."[4]

¶11    Following arguments from the parties, the circuit court orally granted the County's petition for guardianship of Trevor's person, finding that Trevor suffered from an impairment and that his impairment rendered him unable to effectively receive and evaluate information or to make or communicate decisions to such an extent that he cannot care for his physical health and safety.

¶12    In support of this finding, the circuit court cited Novick's testimony that Trevor still had bed sores more than three months after being admitted to the hospital. According to the court, the bed sores were a "serious issue" that "could evolve into sepsis or other severe infection which could endanger [Trevor's] life."

---

[4] Doctor Gail Tasch, a psychiatrist, conducted an independent psychological evaluation of Trevor and completed a report. Tasch did not testify at the final hearing, and her report was not admitted into evidence. Therefore, we will not consider Tasch's examination or medical findings in our analysis.

The court further found that Trevor's living conditions inside of the shack-like structure were "beyond deplorable" and not "habitable for humans." Specifically, the court found, based on the testimony and the admitted exhibits, that the residence was covered "almost wall to wall" with garbage and "enormous amounts of feces, both human and animal."

¶13 The circuit court also granted the County's petition for guardianship of Trevor's estate, finding that Trevor's impairment rendered him unable to effectively receive and evaluate information or to make or communicate decisions related to the management of his property or finances to the extent that his property will be dissipated or he could be financially exploited. In reaching this finding, the court specifically relied on the testimony that Trevor did not "know that he had $3,000" in a van.

¶14 In addition, the circuit court granted the County's petition for protective placement of Trevor, finding that Trevor's impairment caused him to be incapable of providing for his care or custody so as to create a substantial risk of serious harm to himself. The court found that Trevor "doesn't appreciate or understand his impairments, and that his impairments are permanent, and that they are likely progressive and will only continue to get worse." Furthermore, the court stated that despite Trevor surviving in the shack-like structure for several years, his recent decline had changed the circumstances, as evidenced by the "deplorable situation."

¶15 As to placement, the circuit court adopted the County's recommendation that an assessment be completed "so that [Trevor] can be as … independent as he practically can." The court stated that a locked facility was not necessary but that Trevor required 24/7 supervision in a group home, an

assisted living facility, or a nursing home "that would be capable of doing such a thing."

¶16 Thereafter, the circuit court entered written orders consistent with its oral rulings. As part of the written order for the guardianship of Trevor's person, the court removed Trevor's ability to, among other things, register to vote, vote in an election, and apply for a driver's license. The protective placement order designates an unlocked nursing home as the least restrictive placement.[5]

¶17 Trevor now appeals.

## DISCUSSION

¶18 Trevor argues that the County failed to prove by, clear and convincing evidence, that he meets the standards for guardianship and protective placement. On review, we uphold the circuit court's findings of fact unless they are clearly erroneous, but we independently determine whether the evidence presented meets the standards for guardianship and protective placement. *Walworth County v. Therese B.*, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377. "A finding of fact is clearly erroneous if it is against the great weight and clear preponderance of the evidence." *Metropolitan Assocs. v. City of Milwaukee*, 2018 WI 4, ¶62, 379 Wis. 2d 141, 905 N.W.2d 784.

## I. Guardianship

¶19 WISCONSIN STAT. § 54.10(3)(a) sets forth the circumstances under which a circuit court may appoint a guardian of the person and of the estate on the

---

[5] The assessment ordered by the circuit court is not in the record before this court.

basis of incompetency.[6] To obtain guardianship of the person, the petitioner must prove, by clear and convincing evidence, that "because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the individual is unable to meet the essential requirements for his or her physical health and safety." Sec. 54.10(3)(a)2. The phrase "[m]eet the essential requirements for physical health or safety" means to "perform those actions necessary to provide the health care, food, shelter, clothes, personal hygiene, and other care without which serious physical injury or illness will likely occur." WIS. STAT. § 54.01(19).

¶20    To obtain a guardianship of the estate, the petitioner must prove, by clear and convincing evidence, that "because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions related to management of his or her property or financial affairs," to the extent that any of the following applies: "a. The individual has property that will be dissipated in whole or in part[;] b. The individual is unable to provide for his or her support[; or] c. The individual is unable to prevent financial exploitation." WIS. STAT. § 54.10(3)(a)3. "Impairment," as used in § 54.10(3)(a)2. and 3., is defined, in pertinent part, as a "serious and persistent mental illness, degenerative brain disorder, or other like incapacities." WIS. STAT. § 54.01(14).

¶21    Trevor contends that the County failed to prove by, clear and convincing evidence, that he has an impairment. Citing medical journals, Trevor argues that the SLUMS test is "a screening tool," it "should never be considered a

---

[6] There is no dispute that Trevor meets the age requirement for guardianship of his person and estate. *See* WIS. STAT. § 54.10(3)(a)1.

substitute for a full diagnostic workup," and "further testing should have been done to solidify" Trevor's dementia diagnosis. Trevor also argues that the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V), "requires that the diagnosis of a neurocognitive disorder be based on two separate evaluations: cognitive testing and assessment of instrumental activities of daily living."

¶22 However, the medical journals and DSM-V relied upon by Trevor to challenge the weight and credibility of Novick's testimony were not presented in the circuit court. We agree that on appeal Trevor may question the sufficiency of the evidence to support the circuit court's findings. But rather than questioning the sufficiency of the evidence presented, Trevor asks us to consider and rely upon evidence that was not presented in the circuit court. This court is not a factfinding court, *see* **Lange v. LIRC**, 215 Wis. 2d 561, 572, 573 N.W.2d 856 (Ct. App. 1997), and we do not hear new evidence on appeal. Accordingly, we do not address the medical journals and DSM-V further. Imperatively, Trevor does not cite any legal authority for the proposition that the SLUMS test is, as a matter of law, insufficient to diagnose an individual with dementia or that the DSM-V is controlling on the definition of impairment under WIS. STAT. ch. 54. In the absence of controlling legal authority, we will not second-guess the circuit court's reliance on Novick's testimony to find that Trevor has dementia.

¶23 Next, Trevor argues that "[e]ven if the SLUMS test alone could establish" that he has dementia, the County "adduced no evidence to show" that his dementia "was the reason for [his] living conditions or the decline in his physical health." For example, he contends that Novick "had no personal knowledge … and gave no explanation" for his finding that Trevor does not make proper decisions concerning his health.

9

¶24    We agree with the County that Trevor's arguments ignore the evidence presented at the final hearing. Novick opined in his examination report that Trevor's dementia interfered with his ability to, for example, receive and evaluate information, use information to make decisions, communicate decisions, protect himself from neglect, and meet the essential requirements for his safety. Novick further reported that due to Trevor's dementia, his attention/concentration, memory, reasoning, and other executive functioning were mildly impaired and that Trevor does not adequately understand and appreciate the nature and consequences of his impairment. Novick explained that he attempted to ask Trevor questions pertaining to how he gets to the grocery store, how often he starts the generator, and how/if he cooks for himself. However, Trevor was "guarded in his answers," not only because he faced a guardianship petition, but also because "his level of cognitive function is not so strong."

¶25    In addition, Novick testified to the substantial risks of harm that Trevor faced because of his dementia. For example, Novick referenced Trevor's increased risk of frostbite, bed sores, and pneumonia. According to Novick, Trevor does not appreciate the dangers associated with his living conditions or that the bed sores were a result of his living conditions. Furthermore, Wojtysiak explained, with reference to the photographs of Trevor's residence, that Trevor's living conditions posed a danger to him. Trevor was, for example, using a bucket next to a mattress where he slept for a restroom, and his pillow had feces and/or blood on it. Based on this evidence, the circuit court reasonably found that Trevor's dementia inhibited his ability to evaluate information and communicate decisions, resulting in his "beyond deplorable" living conditions.

¶26    Likewise, the evidence reasonably demonstrated that Trevor's bed sores were the result of his dementia and that if it were not for church members

insisting that he go the hospital, Trevor would not have received medically necessary treatment to avert "sepsis or other severe infection." Although Trevor ultimately requested transportation to the hospital, his condition had already deteriorated to the point that hospital staff were still treating his bed sores three months after his admission. The circuit court could reasonably infer that if Trevor were living on his own, he would either not seek medical treatment or he would delay treatment until his condition significantly deteriorated and became potentially life threatening.

¶27 Trevor contends that the County failed to prove that his "less-than-desirable living conditions" were the result of his dementia because the DHS began receiving concerns about Trevor's wellbeing in 2011. The circuit court specifically addressed this argument in its oral ruling, stating that despite Trevor surviving in the shack-like structure for several years, his circumstances changed due to his recent decline, as evidenced by the "deplorable situation." This finding is supported by the fact that church members—who had been bringing Trevor food and firewood for several years—reported Trevor's living conditions in 2024 to the DHS. A reasonable inference from this evidence—in addition to evidence of Trevor's living conditions and his declining health—is that Trevor's wellbeing declined substantially in 2024 due to his dementia.

¶28 To be sure, as Trevor argues, there was evidence presented that Trevor could "independently perform a number of life tasks, all while not having access to a home with heat, electricity, or running water." For example, evidence suggested that he had access to bottled water. However, this evidence does not detract from the other evidence demonstrating that Trevor's dementia prevented him from effectively receiving and evaluating information and communicating decisions to such an extent that he is unable to provide for his physical safety. As

the circuit court found, Trevor's overall health and wellbeing were at serious risk due to his dementia, as evidenced by his bed sores and the state of his residence.

¶29    Trevor asserts that his decision not to answer Novick's questions pertaining to Trevor's ability to go to the grocery store, start the generator, and cook does not demonstrate that he lacked an understanding of how to accomplish these tasks or that he lacked an understanding of his impairment.  Instead, he contends that his decision not to answer those questions demonstrates that he was "guarded" in response to facing a guardianship.  However, the circuit court found that Trevor's answers "were limited answers because … [he] doesn't appreciate his impairments, or the danger to his health and doesn't know how to express the information of his life and those facts effectively."  Trevor fails to adequately explain how or why the court's findings in this regard are clearly erroneous.

¶30    Trevor next argues that the evidence was insufficient to prove by clear and convincing evidence that he required a guardianship for his estate.  Again, we agree with the County that Trevor's arguments ignore the evidence presented at the final hearing.

¶31    Novick opined in his examination report that Trevor's dementia interfered with his ability to protect himself from abuse and exploitation, manage his property and financial affairs, and prevent financial exploitation.  Further, Novick testified that the DHS discovered $3,000 in cash inside of a van on Trevor's property and that Trevor "had no idea he had that money or where it was placed."  A reasonable inference from this testimony is that if Trevor was unaware of the location of this large sum of money, he could not prevent the funds from being dissipated.  Moreover, the evidence demonstrated that Trevor's lack of knowledge about these funds was the result of his dementia, not poor judgment.

*See* WIS. STAT. § 54.10(3)(b). These factual findings by the circuit court are sufficient to meet the guardianship of the estate standard under § 54.10(3)(a)3.a.

¶32 Trevor also argues that the circuit court "made no specific finding, and the [C]ounty adduced no evidence, as to whether any need for assistance in decision[-]making or communication is unable to be met effectively and less restrictively" under WIS. STAT. § 54.10(3)(a)4.

¶33 The County responds that although the circuit court did not reference WIS. STAT. § 54.10(3)(a)4. in its oral ruling, the court's written order granting the County's guardianship petition stated that Trevor's "need for assistance in decision-making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, a supported decision-making agreement, or other means that the individual will accept." According to the County, these findings are minimally sufficient for purposes of rendering a decision on the County's guardianship petition. *See* WIS. STAT. § 805.17(2) ("If an opinion or memorandum of decision is filed, it will be sufficient if the findings of ultimate fact and conclusions of law appear therein."). Trevor does not respond to these arguments, and we deem them conceded. *See **United Co-op. v. Frontier FS Co-op.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578.

¶34 Moreover, as the County contends, these findings are also supported by ample evidence from the final hearing. *See **State v. Pallone***, 2000 WI 77, ¶44 n.13, 236 Wis. 2d 162, 613 N.W.2d 568 (stating that when a circuit court fails to make an explicit factual finding, we assume the court made the finding in a manner that supports its final decision), *overruled on other grounds by **State v. Dearborn***, 2010 WI 84, 327 Wis. 2d 252, 786 N.W.2d 97. Novick testified that no

rehabilitation or training "would reverse [Trevor's] brain power to change the situation," and he opined in his examination report that the alternatives listed in WIS. STAT. § 54.10(3)(a)4. would not eliminate the need for a guardianship of Trevor's person. As the County argued at the final hearing, Trevor's dementia and condition overall are "not going to get better. If anything, [they are] going to get worse." The circuit court agreed, finding that Trevor's dementia is permanent and "likely progressive and will only continue to get worse."

¶35 In a conclusory manner, and without citation to legal authority, Trevor argues that Novick's testimony "falls short of sufficient evidence to show that alternatives are ineffective for someone like" Trevor. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (stating that we need not consider arguments that are undeveloped and unsupported by citations to legal authority). Even if we were to address this argument, we disagree with Trevor's contention. Novick explained that Trevor's dementia cannot be reversed through medication or training.

¶36 Lastly, in terms of the guardianship order, Trevor contends that this court should, at the very least, reverse the guardianship order in part to restore his rights to drive, to register to vote, and to vote in an election.[7] According to Trevor, the only evidence presented pertaining to his driving ability was that he could safely operate a vehicle and he had a valid driver's license. Further, he

---

[7] Trevor also argues, essentially in passing, that we should reverse the guardianship order in part and remand with directions to restore his right to "move about freely." To the extent that Trevor challenges the aspect of the circuit court's guardianship order providing his guardian of person the power to make "decisions related to mobility and travel," we deem that argument undeveloped as it lacks references to the record or to appropriate legal authority. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

contends that the County presented no evidence regarding his inability to understand the election process.

¶37 When a circuit court orders a guardianship of the person, it may "declare that the individual has incapacity to exercise" the right to apply for a driver's license "if the court finds that the individual is incapable of understanding the nature and risks of the licensed or credentialed activity, to the extent that engaging in the activity would pose a substantial risk of physical harm to the individual or others." WIS. STAT. § 54.25(2)(c)1.d. The court may also declare that the individual has incapacity to exercise the right to register to vote or to vote in an election "if the court finds that the individual is incapable of understanding the objective of the elective process." Sec. 54.25(2)(c)1.g. "Any finding under subd. 1. that an individual lacks evaluative capacity to exercise a right must be based on clear and convincing evidence." Sec. 54.25(2)(c)2.

¶38 The circuit court removed Trevor's right to apply for a driver's license. This determination is consistent with Novick's examination report, which recommended the removal of that right. Furthermore, the court's determination is consistent with Novick's medical finding, based on the SLUMS test, that although Trevor was driving on his own prior to his hospitalization, Trevor's dementia mildly impaired his memory, reasoning, attention, concentration, and judgment. Importantly, Novick found that Trevor does not appreciate the nature and consequences of his dementia or how his dementia affects his ability to perform daily tasks. Therefore, the court could reasonably find that Trevor is incapable of understanding the nature and risks of driving, especially in reference to his dementia, so as to pose a substantial risk of harm to himself or others. *See* WIS. STAT. § 54.25(2)(c)1.d.; ***Pallone***, 236 Wis. 2d 162, ¶44 n.13.

15

¶39    As noted above, the circuit court also removed Trevor's right to register to vote and vote in an election. The court did not make any factual findings at the final hearing regarding Trevor's understanding of the objective of the elective process. In fact, the County did not petition to remove this right, and the only admitted evidence specifically in reference to Trevor's capacity to vote came from Novick, who opined that Trevor has "the evaluative capacity to" "register to vote or vote in an election." Given the lack of evidentiary support in the record and the court's failure to explain its reasoning for removing Trevor's right to register to vote and vote in an election, we conclude that the court's finding that Trevor is incapable of understanding the objective of the elective process is clearly erroneous. Accordingly, we reverse the court's guardianship order in part and remand with directions for the reinstatement of Trevor's right to register to vote and vote in an election in a manner consistent with WIS. STAT. § 54.25(2)(c)2.

## II. Protective placement

¶40    A circuit court may order protective placement for an individual if each of the requirements under WIS. STAT. § 55.08 is met by clear and convincing evidence.[8] First, the petitioner must demonstrate that the individual is an adult who has been determined to be incompetent by a circuit court. Sec. 55.08(1)(b). We have already determined that the County met its burden to prove, by clear and convincing evidence, that Trevor is incompetent, and we incorporate that analysis here. *See* WIS. STAT. § 54.01(16).

---

[8] Trevor does not dispute that he has a primary need for residential care and custody or that he has a disability that is permanent or likely to be permanent. *See* WIS. STAT. § 55.08(1)(a), (d).

¶41 Second, the petitioner must demonstrate that as a result of a "developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others." WIS. STAT. § 55.08(1)(c). The "care" alternative in § 55.08(1)(c) "means that the person's incapacity to provide for his or her daily needs creates a substantial risk of serious harm to the person or others." *Jackson Cnty. DHHS v. Susan H.*, 2010 WI App 82, ¶17, 326 Wis. 2d 246, 785 N.W.2d 677. The "custody" alternative in § 55.08(1)(c) applies when "the person cannot provide for himself or herself the protection from abuse, financial exploitation, neglect, and self-neglect that the control and supervision by others can provide." *Susan H.*, 326 Wis. 2d 246, ¶17. "Serious harm may be evidenced by overt acts or acts of omission." Sec. 55.08(1)(c).

¶42 As with his arguments surrounding guardianship in this case, Trevor's arguments against protective placement overlook our standard of review and the evidence presented at the final hearing. For example, Trevor argues that his "hygiene issues were more related to his living conditions than any dementia" and that his "problems were more related to his chosen way of living than his mental health diagnosis."

¶43 The circuit court disagreed with these arguments. The evidence reasonably demonstrated that Trevor's dementia renders him incapable of providing for his daily needs and caused his worsening living conditions thereby creating a substantial risk of harm to himself. Trevor presented to the hospital with severe bed sores that took at least three months to treat; he cannot bathe himself; he cannot cook for himself; and he suffers from incontinence. In addition, Trevor's living conditions posed a substantial risk of harm to himself

because he could not care for himself or the property. The residence was filled with human and animal waste, there was blood and/or feces on his pillow, and holes in the walls exposed the interior to the elements. As we have explained, a reasonable finding from the evidence is that Trevor's wellbeing declined substantially in 2024 due to his dementia.

¶44 Contrary to his arguments on appeal, this evidence demonstrates that because of his dementia, Trevor did not understand and appreciate the dangerousness of his living conditions, and was therefore not making a knowing and voluntary choice about the way he was living. *See Zander v. County of Eau Claire*, 87 Wis. 2d 503, 513, 275 N.W.2d 143 (Ct. App. 1979). Stated differently, Trevor was not choosing to live in these conditions or decline in health without prompt medical treatment. The dangerous issues Trevor faced were caused by dementia, and were not of his choosing.

¶45 Trevor also contends that the circuit court erred by ordering placement in a nursing facility, which, according to Trevor, was "the most restrictive placement of the settings recommended." Even if all of the requirements for protective placement under WIS. STAT. § 55.08(1) are met, the circuit court must order protective placement to "the least restrictive environment and in the least restrictive manner consistent with the needs of the individual to be protected and with the resources of the county department." WIS. STAT. § 55.12(3).

¶46 The County responds that the circuit court ordered placement in an unlocked nursing home facility with 24/7 supervision, up to and including a nursing home. This order was supported by Novick's report as well as his testimony in which he recommended an unlocked unit with 24/7 care. Novick

explained that "maybe a group home would work, but it has to be a supervised living situation. It couldn't be like assisted living, where he has his own independence. I think it requires intensity of caretakers."

¶47 Trevor fails to explain how the circuit court's order is inconsistent with Novick's recommendation or is not supported by the record, but he instead argues that there was "no testimony that another home" with running water, heat, and electricity "was offered to [Trevor]." However, no evidence was presented such a placement was available given the County's resources, *see* WIS. STAT. § 55.12(3), and regardless, it would not provide Trevor with the 24/7 care recommended by Novick.

¶48 In short, we affirm the circuit court's guardianship and protective placement orders in all but one respect. Consistent with WIS. STAT. § 54.25(2)(c)2., the court shall reinstate Trevor's right to register to vote and vote in an election.

*By the Court.*—Order affirmed in part and reversed in part; order affirmed; cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.